# Exhibit A

ANDREW R. DEEMER, M.D.
GENERAL & VASCULAR SURGERY

3998 VISTA WAY, SUITE C-200
OCEANSIDE, CA 92056-4589

(760) 724-5352
FAX (760) 724-5447

July 11, 2001

Neil Levine, M.D.
910 Sycamore, Ste. 270
Vista, CA 92083

**RE: ELICH, Joseph**

Dear Neil:

I saw Joseph Elich in the office today for evaluation of his lower extremity ischemia. As you know, Mr. Elich is a very pleasant 69-year-old gentleman who is a lifelong smoker. Several months ago, he noticed bilateral calf pain with exercise when he was trying to climb a ladder to be able to paint his house in Mexico. Going up and down the ladder caused him significant discomfort in the calves; they "tightened up." Since that time, he has been aware of bilateral calf claudication at about 100-150 feet. This is reproducible and consistent.

A lower extremity non-invasive study was done on June 20th which, as I am sure you know, shows high-grade mid-right superficial femoral artery stenosis, and a moderate mid-left superficial femoral artery stenosis. Also of note is that on the left side, the wave changes from biphasic to monophasic in the common femoral artery and the proximal superficial femoral artery. On both sides, the ankle/brachial indices are about 0.72.

On physical examination, he has a prominent right carotid bruit. His lungs are clear and his abdomen is soft. He does not have a palpable abdominal aortic aneurysm and does not have an abdominal bruit. His femoral pulses are palpable with a left femoral bruit, and his pedal pulses are palpable, although they are significantly diminished.

I had a long discussion with Mr. Elich and his wife about peripheral vascular disease. Based on his symptoms and physical findings, I do not think he is currently a surgical candidate, although he may benefit from angioplasty of the superficial femoral artery stenoses. I think he also has a significant degree of stenosis at the left common femoral artery that was not appreciated on the non-invasive study done last month. Consequently, even though the stenosis in the left superficial artery is really only moderate, his symptoms are just as bad on the left. I also think his right carotid bruit should be evaluated by an ultrasound.

Confidential, Subject to Protective Order

Mr. and Mrs. Elich and I discussed the options available to them. He would like to try medical management of his claudication before undergoing angiography or angioplasty. I gave him a prescription for Pletal (Cilostazol). There is growing clinical evidence that this is a significantly better claudication medication than Trental (Pentoxifylline). I plan to see Mr. Elich back in the office in about a month or so to see if he has had any improvement with that intervention.

Thank you very much for allowing me to participate in the care of this very pleasant gentleman.

Sincerely,

Andrew R. Deemer, M.D.

ARD/eb

Confidential, Subject
to Protective Order

**ELICH, Joseph (6-12-01)**

S: For approximately two to three weeks, after doing heavy painting work and moving heavy ladder with up to 15 hours per day of painting with a roller and a brush, the patient has had discomfort in the calves, thighs, and buttocks with activities only, not at rest. There is also one trigger point on the right upper pelvic area posteriorly. The patient has no symptoms overnight or at rest. He has had no swelling of his legs. There have been no rashes. He had some chest discomfort on the lateral left chest wall for several minutes which was dull, possibly related to repetitive motion. His calcium CT score shows moderate risk, but he is unable exercise to do an ETT. I need to obtain his lung score. The patient is having no classic coronary disease symptoms or pulmonary symptoms. He is in good spirits. Data: 5/01 - stool cards x three negative; 4/01 - TFTs, CBC, LFTs, and lipids.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 6-13-01

Confidential, Subject to Protective Order

AGE: 69

**PROBLEM-ORIENTED FOLLOW UP VISIT**

DATE: 6-12-01 PATIENT: Joseph Elick ALLERGIES: PCN

MEDS: SEE LIST in chart ⊕

DATA: (1)

CC: F/U to discuss CT results — BP
off/on pains + aches in legs x 1yr ⊕ — BP

(1) ∅

**VS:** GEN: A and O x 4, NAD, Well Kept; Other

ENT: Ears: R: TM: Red NL Fluid; EC:NL DC Red: L: TM: Red NL Fluid; EC: NL DC Red

**BP:** Nose: R : Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear

L: Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear

112/74 Throat: NL Red ; Cobblestoning Exudates white gray Lesions: No Yes

**P.** NECK: **Nodes** NL ant post cervical supraclav small medium large mobile fixed tender yes no

92 Vessels JVP: NL ↑ ; Carotids: NL Bruit R L Contour NL ↑ ↓

**Thyroid** NL ↑ Symetric Asymmetric Nodule Multinodular

**WT:** LUNGS: CTAP Crackles Wheezes Rhonchi RUL RML RLL LUL LLL

Dullness ↓Fremitus E→A RUL RML RLL LUL LLL

164 **C-V: RRR ∅mrg** M: SEM HOLO DIASTOLIC __/6; S3 S4 No chronic art findings

**TEMP** PMI NL Displaced toward AAL

Pulses: All NL All NL x ↓: R L PT; R L DP +-sl. ↓ PT/DP; No edema

ABD: Scaphoid Protuberant Obese Soft Nontender BS + BS - Tender Rigid RUQ RLQ LLQ LUQ

∅HSM ↑: Liver ____ cm ↑Spleen - + MASS:

Aorta NP Palpable: ____ cm. Bruit - + RECTAL/PROSTATE:

M-S: DJD: Acute Δ's Chronic Δ's General; Local: Fingers Hands Knees Ankles Feet

NL Inflammation Tender Warm Red Effusion ↓ROM

Chest wall NT

OTHER: Muscles NT
Knees NT Hips → low back Nontender; Spine FROM

SKIN: NL Dry ABCD Malignant Lesions Rash:

AK: Scalp___Face___Neck____Upchest_____UpBack_____TX-LN2,SAM,PPC, I.C.

RForearm____LForearm_____RHand____LHand______

SK IRRITATED: ;VV: TAGS INFLAMED:

NEURO: NL Screen All Systems Below x

MSE: A&Ox _______; CN 2-12: Intact Discs/Fundi- Lesion in CN:

Motor: NL x FOCAL DEFICIT:

Reflexes: NL xFOCAL DEFICIT

Confidential, Subject to Protective Order

Cerebellar: NL_ ABN: FNF FFM RAM HS Rhomberg Tandom Gait

Sensory: NL x GAIT: NL ABN:

A/P BY PROBLEMS:

(A) (1) CP → Vessels: need to do stress test on heart
(1) ↑ I resolve leg sx issue; may need Adenosine/Thallium
(2) Leg sx = probably MS, but ✓ arterial flow study
Stretch all the muscle groups as directed!
(3) Chest wall probably etiology of some 20%
overall; No e/o ischemia on EKG

NDL000018jre

(4) Cont. Pt's other PE!

F/U: [illegible] (5) AAA screen also ordered.

**ELICH, Joseph (12-18-00)**

S: Joe is doing well. He is doing yard work and engine work and keeping very busy with physical labor. He has no chest pain, shortness of breath, PND, orthopnea. Only if he drinks alcohol does he have frequency to urinate without urgency, decreased stream, or dribbling. No bleeding. He has some mild right low paraspinal back spasms. His medications are being tolerated. He has some bumps and bruises on his skin from his work. He is not using moisturizer or skin protection and has several lesions to check.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 12-19-00/T: 12-19-00

Confidential, Subject to Protective Order

AGE: 69 **PROBLEM-ORIENTED FOLLOW UP VISIT**

DATE: 12-18-00 PATIENT: Joe Elich ALLERGIES: PCN

MEDS: SEE LIST 12-18-00 ⊕

DATA: 9/00 TFT; LFT/CBC; Glu, K, CMP, Lipids; 7/99 Carotid US

CC: prostate check Foley/BCC

HABITS 4/21/00

**VS:** GEN: A and O x 4, NAD, Well Kept; Other

ENT: **Ears**: **R**: **TM**: Red NL Fluid; **EC**:NL DC Red: **L**: **TM**: Red NL Fluid; **EC**: NL DC Red

**BP:** 118/82 **Nose**: **R** : Mucosa: NL Red Pale Boggy ; Phlegm green grey heme clear

L: Mucosa: NL Red Pale Boggy ; Phlegm green grey heme clear

**Throat**: NL Red ; Cobblestoning Exudates white gray Lesions: No Yes

**P.** 84 NECK: **Nodes** NL ant post cervical supraclav small medium large mobile fixed tender yes no

**Vessels** JVP: NL ↑ ; Carotids: NL Bruit R L Contour NL ↑ ↓

**Thyroid** NL ↑ Symetric Asymmetric Nodule Multinodular

**WT:** 164 LUNGS: CTAP Crackles Wheezes Rhonchi RUL RML RLL LUL LLL

Dullness ↓ Fremitus E→A RUL RML RLL LUL LLL

**C-V: RRR ∅mrg** ; M: SEM HOLO DIASTOLIC /6 ; S3 S4

**TEMP PMI** NL Displaced toward AAL

**Pulses**: All NL All NL x ↓: R L PT: R L DP

ABD: Scaphoid Protuberant Obese Soft Nontender BS+ BS - Tender Rigid RUQ RLQ LLQ LUQ

ϕHSM ↑ : Liver cm ↑Spleen - + MASS:

Aorta NP Palpable: cm. Bruit - + RECTAL PROSTATE:

M-S: DJD: Acute Δ's Chronic Δ's General ; Local: Fingers Hands Knees Ankles Feet

NL Inflammation Tender Warm Red Effusion ↓ROM

OTHER → prostate 20-25g, NT, ∅ nodules; penis/scrotum/inguinal/testes

→ mult. nevi back NT Spine NT

→ no recurrent/suspected lesions x mild [illegible] dermatitis

SKIN: NL Dry ABCD Malignant Lesions Rash:

benign eczema [illegible]

AK: Scalp Face 2 Neck Upchest --UpBack TX-LN2,SAM,PPC, I.C

RForearm 2 LForearm 2 RHand LHand

SK IRRITATED: ;VV: TAGS INFLAMED:

NEURO: NL Screen All Systems Below x

MSE: A&Ox ; CN 2-12: Intact Discs/Fundi- Lesion in CN:

Motor: NL x FOCAL DEFICIT:

Reflexes: NL xFOCAL DEFICIT

Cerebellar: NL ABN: FNF FFM RAM HS Rhomberg Tandom Gait

Sensory: NL x GAIT: NL ABN:

Confidential, Subject to Protective Order

A/P BY PROBLEMS:

(A) NO Prostate/GU → VPA Screen

(2) CAD → ASA, active, ACC, DC tobacco

(3) Skin Care → pt not, [illegible] with TX to Dermatol

Skin [illegible] AK TX, Skin protection

(4) HTN → Surveillance Lipids/LFT/TFT

NDL000022jre

F/U:

**ELICH, Joseph (6-21-00)**

S: Joe is here for routine follow-up. His habits, medications, and data are reviewed. He is very pleased with his eye surgery. He does extensive gardening, yard, and maintenance work which is high energy output, without chest pain, shortness of breath. He has no PND, orthopnea, and no chronic cough or wheezing. He has no upper or lower GI symptoms, change in bowel or bladder function. He has a good energy level and good sleep. He declines tobacco cessation. He will have occasional discomfort in MCP area #1 of his right hand with overuse, but is adamant against any further treatment or evaluation. Constitutionally, he is doing well.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 6-21-00/T: 6-21-00

Confidential, Subject to Protective Order

## PROBLEM-ORIENTED FOLLOW UP VISIT

DATE: 6-21-00 PATIENT: Joseph Eliah ALLERGIES: PCN

MEDS: SEE LIST 6-21-00 ⊕ Glucosamine t10

DATA: LFT/Lipids 3/00; 1/00 Stool⊖; PSA 12/99; 4/99 TFT

CC: F/U as per M.D. pt voices ∅ new complaints

Tobacco⊖

Exercise-yardwork/maintenance

Alcohol-2 drinks/week

Caffeine-1 cap/day

Confidential, Subject to Protective Order

VS: GEN: A and O x 4, (NAD) (Well Kept) Other pleasant, good spirits

B/P 112/78

P. 72

WT. 166

TEMP

ENT: Ears: R: TM: Red NL Fluid; EC:NL DC Red: L: TM: Red NL Fluid; EC: NL DC Red

Nose: R: Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear

L: Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear

(Throat: NL) Red; Cobblestoning Exudates white gray Lesions: No Yes

(NECK: Nodes NL) ant post cervical supraclav small medium large mobile fixed tender yes no

Vessels JVP: (NL) ↑ (Carotids: NL) Bruit R L Contour NL ↑ ↓

(Thyroid NL) ↑ Symetric Asymmetric Nodule Multinodular

(LUNGS: CTAP) Crackles Wheezes Rhonchi RUL RML RLL LUL LLL

Dullness ↓Fremitus E→A RUL RML RLL LUL LLL

(C-V: RRR ∅mrg) M: SEM HOLO DIASTOLIC ___/6; S3 S4

(PMI NL) Displaced toward AAL

(Pulses: All NL) All NL x ↓: R L PT; R L DP

ABD: (Scaphoid) Protuberant Obese (Soft) (Nontender) Tender Rigid RUQ RLQ LLQ LUQ

(∅HSM) ↑: Liver NL cm ↑Spleen Mass No Ascites

(Aorta NP) Palpable: No cm. Tender Bruit RECTAL:

M-S: DJD: Acute Δ's (Chronic Δ's) General; Local: (Fingers) (Hands) Knees Ankles Feet

Acute Δ's: Inflammation Tender Warm Red Effusion ↓ROM

OTHER:

SKIN: NL Dry ABCD Malignant Lesions Rash:

(AK) Scalp ___ Face ___ Neck 3 Upchest ___ UpBack 2 TX-LN2,SAM,PPC, I.C.

RForearm 3 LForearm 4 RHand ___ LHand ___

SK IRRITATED: ___ TAGS INFLAMED: ___

(NEURO) (NL X All Systems Below) x

MSE: A&Ox ___; CN 2-12: Intact (Discs/Fundi-) Lesion in CN: NL

(Motor: NL) x FOCAL DEFICIT:

(Reflexes: NL) x FOCAL DEFICIT

(Cerebellar: NL) ABN: FNF FFM RAM HS Rhomberg Tandom Gait

(Sensory: NL) x (GAIT: NL) ABN:

NDL000029jre

A/P BY PROBLEMS:

1. CAD stable; again declines tobacco cessation; continue exercise
2. Lipids: patient ADRs: LFT, lipids
3. Skin infection / care; pt is [illegible] lapsed
4. pt requests of renewal [illegible] waiver signed for all labs
5. DJD hands pt [illegible] [illegible] mat [illegible] due to
6. overuse, esp MCP #1 (R) hand.
7.

F/U: ___ E/F:

**ELICH, Joseph (7-7-99)**

**S:** Joe is here for a follow-up visit. He continues to note easy bruising with purpura-like lesions on the left upper extremity, but no nose bleeds, GI bleeding, or GI upset. He did have some abdominal cramping x one day - probably related to food-borne illness which his wife has with diarrhea. He is tolerating Baycol well without difficulties. He has had no TIA or CVA symptoms. He has had no dizziness or near syncope. No chest pain or shortness of breath, PND, orthopnea. I have reviewed his carotid artery studies with a history of carotid artery disease. Medications and data are reviewed.

**O:** On exam, there is a right carotid bruit versus a radiated murmur. However, auscultation of the heart reveals a very faint ejection murmur-like quality at the aortic area which is heard loudest at the carotid and does not radiate beyond the aortic area towards the left. No other murmurs, rubs, or gallops. Abdomen is flat and benign. Aorta nonpalpable. Full pulses throughout. Abdomen is benign. Actinic damage is noted and treated after his consent: Two on the left upper extremity lateral dorsal; two on the face/forehead; and a verruca vulgaris on the left upper extremity with liquid nitrogen spray applicator method. Post procedure care and skin care and protection reviewed.

**ASSESSMENT AND PLAN:** Joe has had a food-borne illness which is self-limited - follow-up observation reviewed. Carotid artery disease - at risk because of tobacco abuse which he does not wish to discontinue though strategies offered. Carotid ultrasound and follow-up obtained. Carotid artery disease is stable. Continue regimen. Check LFTs and lipids in three months. Purpura, left hand, secondary to aspirin. On a risk/benefit basis, we have decided to change aspirin to 325 one half tablet daily. I will see him in three months, prn, and based upon above.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 7-7-99/T: 7-7-99

Confidential, Subject to Protective Order

**ELICH, Joseph (6-2-98)**

**S:** Medications, data, habits, problem list are reviewed. Joe is doing well. Lipitor caused positional dizziness over the two month course he took it. He discontinued it and the symptoms completely resolved. He is working aggressively in the yard and at home, without symptoms of TIA, CVA, PVD, CAD. The patient continues to smoke, but is "symptom-free" from this. He is tolerating his medications well. He has no symptoms of hyper or hypothyroid. The patient does have thickened nails which he has read about and placed request for literature for Sporanox. He does have exposure to heavy damp foot conditions predisposing him to this. His GERD is controlled with Zantac though, on occasion, there is some bloating. He does not alter his diet.

**O:** On exam, EENT is benign. He is euvolemic. Neck vessels negative. No bruits. Carotid upstroke full. Chest clear. Cor regular rhythm and rate. No change from his baseline. Abdomen benign. Extremities negative. Good pulses. Thickened nails consistent with onychomycosis and hyperkeratoses. Skin exam is written.

**ASSESSMENT AND PLAN:** We will recheck patient's lipid profile off treatment, but our target will always be LDL less than 100. Samples of Baycol are given as we may institute this reviewing the side effects, risks/benefits profile. A thyroid study check for monitoring hypothyroid is done. Nail culture is checked for fungal infection and possible treatment. The treatment options, with the patient, are reviewed, including Sporanox, its side effects, benefits, and risk profile of which he has accepted them should culture return positive. Finally, smoking cessation and counseling again offered regarding cardiac risk factors for him to consider. Follow-up in three months, and prn.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 6-2-98/T: 6-3-98

Confidential, Subject to Protective Order

10/29/01 12:46 Instrument #:A0572344

MEDICAL GROUP OF NORTH COUNTY
910 SYCAMORE AVENUE SUITE 270
VISTA CA 92083
760-598-1776
KIPPER ADLER JARAMILLO VICARIO DANA LEVINE
FRAKES ROGERS HERGESHEIMER CZVIK BESSUDO

Sample ID: 16922
Name: ELICH JOSEPH ,
Patient ID:
Carrier/Pos: 3( 3)
Comment:

Age: 69
Sex: M
Doctor:
Date/Time Run: 10/29/01 12:45

| ASSAY | LOW/HIGH | RESULT | REFERENCE RANGE |
|---|---|---|---|
| SODIUM | | 139 mEq/L | 136 - 145 |
| POTASS | H | 5.5 mEq/L | 3.5 - 5.3 |
| GLUC | H | 173 mg/dL | 70 - 125 |
| CREAT *Improved* | H | 1.4 mg/dL | 0.7 - 1.3 |
| Urea | | 22 mg/dL | 5 - 25 |
| TRIGLY | | 147 mg/dL | 1.0 - 200.0 |
| Chol | H | 239 mg/dL | 130 - 200.0 |
| HDL | | 45 mg/dL | 35.0 - 75.0 |
| LDL | H | 192 mg/dL | 20 - 130 |

*[signatures]*

Confidential, Subject to Protective Order

NDL000073jre

MEDICAL GROUP OF NORTH COUNTY
910 SYCAMORE STE 270
VISTA CA 92083
760-598-1776
KIPPER ADLER JARAMILLO VICARIO DANA LEVINE FRAKES ROGERS

NAME: JOSEPH ELICH-L SAMPLE ID: 16992

SAMPLE ENTERED 2:36 PM 02-SEP-98

REPORT PRINTED 3:42 PM 02-SEP-98

| TEST NAME | RESULT | CODE | UNITS | NORMAL RANGE |
|---|---|---|---|---|
| ALBUMIN | 4.6 | | G/DL | 3.2 - 5.5 |
| TOTAL BILIRUBIN | 0.9 | | MG/DL | 0.4 - 1.5 |
| ALK PHOS | 86. | | IU/L | 36. - 92. |
| AST | 17. | | IU/L | 16. - 40. |
| ALT | 18. | | IU/L | 8. - 53. |
| TRIGLYCERIDES | 127. | | MG/DL | 0. - 210. |
| CHOLESTEROL | 182. | | MG/DL | 131. - 200. |
| HDL | 35. | | MG/DL | 30. - 90. |
| TOTAL CHOL/HDL | 5.2 | | RATIO | 3.7 - 6.7 |
| LDL | 122. | | MG/DL | 65. - 130. |
| DIRECT BILIRUBIN | 0.3 | | MG/DL | 0.0 - 0.5 |

~~CHART~~

DRAMATIC improvement in Total (↓ From 211 to 182) AND LDL (↓ from 161 to 122!). Continue Baycol great news!

9-3
wife aware

MEDICAL GROUP OF NORTH COUNTY
910 SYCAMORE STE 270
VISTA CA 92083
760-598-1776
KIPPER ADLER JARAMILLO VICARIO DANNA LEVINE MCKEE FRAKES

NAME: JOSEPH ELICH-L SAMPLE ID: 16992

SAMPLE ENTERED 2:29 PM 02-JUN-98

REPORT PRINTED 3:08 PM 02-JUN-98

| TEST NAME | RESULT | | CODE | UNITS | NORMAL RANGE |
|---|---|---|---|---|---|
| TRIGLYCERIDES | 88. | 105 | | MG/DL | 0. - 210. |
| CHOLESTEROL | 211. | HIGH 137 | | MG/DL | 131. - 200. |
| .DL | 32. | | | MG/DL | 30. - 90. |
| TOTAL CHOL/HDL | 6.5 | 34 | | RATIO | 3.7 - 6.7 |
| '.DL | 161. | HIGH 76 | | MG/DL | 65. - 130. |

1) Cholesterol did ↑ off Lipitor
Recc use Baycol, one at dinner time
If tolerates → call for Rx
If overspent, call us to let us know
monitor for liver area pain } call
muscle pain } if have this

2) If stay on it,
re-✓ liver/kidneys 6 months!

Pt already on Baycol samples was given by NL, is tolerating well. Rx phoned to 471-9007 BKS

Confidential, Subject to Protective Order

NDL000100jre

DISCHARGE SUMMARY

ATTN:
CC: FLANDERS, MULCAHY
DAYS STAY:

ADMITTED: 4/4/90 DISCHARGED: 4/6/90

ADMITTING DX:
1. Probable new onset angina pectoris.
2. Hypertension, probably essential.
3. Hypercholesterolemia and hypertriglyceridemia.
4. Status post cholecystectomy.
5. Moderate carotid artery obstructive disease noted angiographically.

FINAL DX:
1. New onset, unstable angina pectoris.
2. Status post successful percutaneous transluminal coronary angioplasty of the circumflex division of the left coronary artery, with reduction of a 99% obstructive lesion down to approximately 10% obstruction.
3. Hypercholesterolemia and hypertriglyceridemia.
4. Status post cholecystectomy.
5. Moderate carotid artery obstructive disease noted angiographically.

HISTORY:
The patient is a 58 year old gentleman admitted for cardiac catheterization and coronary angiography because of new onset unstable angina pectoris. For details of his present illness, past and personal history, family history and system review, please see the admission workup.

PHYSICAL EXAMINATION:
The physical examination at the time of discharge from the hospital was similar to that of admission. His vital signs were good and stable, with a BP of 130/74; pulse 90 and regular; respirations 18 per minute.

HOSPITAL COURSE:
The patient underwent cardiac catheterization and selective coronary angiography without incident. Because of the finding of severe obstructive disease of the circumflex division of the left coronary artery, he underwent successful PTCA of that vessel. At the time of discharge from the hospital the right groin was free of ecchymosis, edema or induration, and the right lower extremity revealed no evidence of arterial or venous insufficiency.

LABORATORY DATA:
CBC - elevated WBC of 13,800, which was felt to be perhaps due to a mild viral infection. His hemoglobin was normal at 15.7. His temperature was normal and his WBC persistently was in that 13,000 range, so, this may in effect be a normal value for this particular patient. His hematological studies were within normal limits. The chest x-ray

______ M.D.

Confidential, Subject to Protective Order

REPORT BY ATTENDING: S. SNYDER, M.D.
Page 1 of 2

NDL000128jre

NUMBER 31 46 16
NAME ELICH, JOSEPH R.

revealed no active disease process. Electrocardiogram revealed some ischemic T-wave abnormalities in the lateral leads. Cardiac catheterization data revealed a normal left ventriculogram, a dominant right coronary artery. There was plaquing of the mid and distal thirds of the LAD; 30-40% obstruction of the proximal right coronary artery. The 99% occlusion of the circumflex prior to PTCA was reduced to 10% post-PTCA.

DISPOSITION:
The patient was discharged from the hospital with the usual information and activity, diet, etc. He will be followed in Cardiac Rehab. Since he was seen in the hospital by Doctor Westphal, for Foley catheter insertion, he will also be seen as an outpatient by Doctor Westphal. The patient was discharged on Aspirin grains 5 daily, Dipyridamole 75 mg. t.i.d. and Procardiac 10 mg. t.i.d. He is to be seen in the office by me in approximately 7-10 days.

SS:ss/LAD
D: 4/6/90
T: 4/10/90

Confidential, Subject to Protective Order

M.D.

REPORT BY ATTENDING: S. SNYDER, M.D.
Page 2 of 2

NDL000129jre

NUMBER 31 46 16
NAME ELICH, JOSEPH R.

PRESBYTERIAN INTERCOMMUNITY HOSPITAL

12401 E. Washington Blvd. Whittier, Calif. 90602

RMG.
**RADIOLOGY MEDICAL GROUP, INC.**

**ENCINITAS IMAGING CENTER**
**477 N. EL CAMINO REAL, SUITE A102**
**ENCINITAS, CA 92024**
**PHONE: (619) 849-XRAY (849-9729)**

DIAGNOSTIC RADIOLOGY
Hano A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doemeny, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Coopers, M.D.
Eric K. Lizerbram, M.D.

CENTRALIZED NUMBERS
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

DIAGNOSTIC RADIOLOGY OFFICES

FIRST & LAUREL IMAGING CENTER
66 First Avenue
San Diego, CA 92101-4492
FAX (619) 696-7859

SCRIPPS MERCY HEALTHCARE
Department of Radiology
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX (619) 543-1076

MERCY MAGNETIC IMAGING CENTER
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX (619) 543-1076

ENCINITAS IMAGING CENTER
477 N. El Camino Real, Suite A102
Encinitas, CA 92024-1329
FAX (760) 632-5389

ADMINISTRATIVE OFFICE
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA 92163-4307
FAX (619) 294-8399

Check out our web site
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
|---|---|---|
| **ELICH, JOSEPH** | 2394056 | 2394056 |

| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|---|
| **NEIL LEVINE M.D.** | [redacted]31 | 69/M | 06-20-01 |

**910 SYCAMORE AVENUE**
**SUITE 270**
**VISTA, CA 92083**

(1) Call pt → there is evidence for Atherosclerosis of leg arteries causing Sx

**PROCEDURE:** 1. COLOR DUPLEX DOPPLER ULTRASOUND BILATERAL LOWER EXTREMITY ARTERIAL EXAMINATION
2. ULTRASOUND OF ABDOMINAL AORTA

(2) Rec → see vascular surgeon to learn All options

**COMPARISON:** None.

**HISTORY:** History of aching joints, left greater than right.

**TECHNIQUE:** A comprehensive color duplex Doppler ultrasound examination of both lower extremities and high-resolution real-time ultrasound examination of the abdominal aorta was performed. Color image and Doppler wave form analysis, and peak systolic flow measurements of the common femoral, profunda femoral, superficial femoral, and popliteal arteries were performed. Ankle/brachial indices were measured.

(3) Rec Dr. Deemer

**FINDINGS:** The abdominal aorta shows normal tapering morphology. No aneurysm is seen. There is mild atherosclerotic disease identified. The proximal common iliac arteries also are patent and normal in caliber.

(4) This will be mailed as INFO/learning visit.

Right lower extremity runoff: There is a mild to moderate degree of diffuse atherosclerotic disease seen on gray scale imaging. Wave form analysis shows evidence of predominately biphasic wave forms throughout the right lower extremity. Velocities are within normal limits with the exception of quite elevated velocities in the mid to distal superficial femoral artery measuring up to 450 cm per second. These returned to more normal velocity at the level of the popliteal artery. Ankle/brachial index is 0.72.

Left lower extremity: There is a mild to moderate degree of atherosclerotic disease diffusely throughout the left lower extremity as well. The wave forms are predominately biphasic with a monophasic wave form seen in the common femoral artery and in the proximal superficial femoral artery. Velocity measurements obtained reach a maximum of 224 cm per second at the mid level superficial femoral artery and return to more normal levels at the popliteal artery. Ankle/brachial index is 0.74.

6-21-01

CONTINUED.................

F 6/21/01

Confidential, Subject to Protective Order

6-21-01

THIS REPORT IS BASED SOLELY UPON THE RADIOLOGICAL EXAMINATION. CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

RMG®

**RADIOLOGY MEDICAL GROUP, INC.**

**ENCINITAS IMAGING CENTER**
**477 N. EL CAMINO REAL, SUITE A102**
**ENCINITAS, CA 92024**
**PHONE: (619) 849-XRAY (849-9729)**

DIAGNOSTIC RADIOLOGY
Hano A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doemeny, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

CENTRALIZED NUMBERS
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

DIAGNOSTIC RADIOLOGY OFFICES

FIRST & LAUREL IMAGING CENTER
466 First Avenue
San Diego, CA 92101-1492
FAX: (619) 696-7859

SCRIPPS MERCY HEALTHCARE
Department of Radiology
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

MERCY MAGNETIC IMAGING CENTER
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

ENCINITAS IMAGING CENTER
477 N. El Camino Real,
Suite A102
Encinitas, CA 92024-1329
FAX: (760) 632-5389

ADMINISTRATIVE OFFICE
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA 92163-4307
FAX: (619) 294-8399

Check out our website
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | | MEDICAL RECORD NUMBER |
|---|---|---|---|
| **ELICH, JOSEPH** | **2394056** | | **2394056** |
| **AT THE REQUEST OF** | **DATE OF BIRTH** | **AGE/SEX** | **DATE OF SERVICE** |
| **NEIL LEVINE M.D.** | **[redacted]31** | **69/M** | **06-20-01** |

**NEIL LEVINE M.D.**
**910 SYCAMORE AVENUE**
**SUITE 270**
**VISTA, CA 92083**

PAGE TWO: 1. COLOR DUPLEX DOPPLER ULTRASOUND BILATERAL LOWER EXTREMITY ARTERIAL EXAMINATION
2. ULTRASOUND OF ABDOMINAL AORTA

**CONCLUSION:**

1. **Mild to moderate degree of atherosclerotic disease affecting the abdominal aorta and both lower extremities.**

2. **More focal area of moderate to severe narrowing involving the mid to distal superficial femoral artery on the right where velocity measurements and wave forms would indicate a 75-90% stenosis.**

3. **Velocity measurements corresponding to a moderate degree of stenosis involving the mid left superficial femoral artery.**

4. **Ankle/brachial indices indicating moderate flow impairment to the lower extremities bilaterally.**

Thank you for referring this patient,

James A. Cooper, M.D.
ggf
Dictated: 6/20/01; Typed: 6/21/01

Confidential, Subject to Protective Order

THIS REPORT IS BASED SOLELY UPON THE RADIOLOGICAL EXAMINATION. CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

NDL000146jre

# Exhibit B

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | ) |
| This Document Relates to: | ) MDL No. 1431 (MJD) |
| Joseph R. Elich, et al. v. Bayer Corp.,et al. | ) Case No. 02-0434 |

DEPOSITION OF JOSEPH R. ELICH

SAN DIEGO, CALIFORNIA

MAY 18, 2006

LINDA BABONAS, CSR NO. 3076

JOSEPH R. ELICH,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. SON:
Q. Good morning, Mr. Elich. My name is Christine Son. I represent Bayer Corporation, and I'll be taking your deposition this morning.
A. Okay.
Q. Could you state your full name for the record, please.
A. Joseph Ralph Elich, E-l-i-c-h.
Q. Have you ever testified in court before?
A. Yes.
Q. On how many occasions?
A. Two.
Q. The first incident, what was that related to?
A. It was a lawsuit against the federal government, and this was back in the '80s.
Q. And were you the plaintiff?
A. No, my corporation.
Q. What was the nature of the lawsuit?
A. Government didn't pay their bills.
Q. You were a witness in that trial? You were a

BY MS. SON:

Q. Right. Well, seeing the doctor's name and the time period and so forth, does it reflect -- does it refresh your recollection as to whether you were diagnosed with high cholesterol?

A. No. I don't remember.

Q. So when is the first time that you recollect being diagnosed with high cholesterol?

A. This was Dr. Levine.

Q. In what year?

A. I forget how many years ago. Probably 2000, 2001, something like that. That's when he -- I was taking another product until it was switched over to Baycol.

Q. You mean another product to control your high cholesterol?

A. Yeah, but it didn't work.

Q. Okay. Was the name of that medicine Lipitor?

A. Yes.

Q. So you were taking Lipitor. It didn't work to control your cholesterol, so Dr. Levine prescribed Baycol; is that right?

A. That's correct.

Q. Besides Lipitor and Baycol, are there any other medicines that you've taken to control your high

MR. FOLDENAUER: The question is, has any doctor told you, you need to control your diet. So we're not discussing the causes of cholesterol.

THE WITNESS: Dr. Levine, the only thing he says is to cut out the fats. That's it, and stay what you're doing.

BY MS. SON:

Q. So without the medications, then, let's say before you started taking Lipitor and Baycol, was your diet and your exercise effective in controlling your cholesterol?

A. It would drop it but not sufficient enough to what they wanted. Before they had different, oh, ranges that they would call it. This was a safe range. Now everything is being dropped lower and lower. You can see that on television every day.

Q. So diet and exercise was not enough to control your cholesterol to the level that the doctors wanted it to be?

A. It depends on what you eat. It will kick it right up.

Q. So -- I'm sorry. You just didn't answer my question. So the diet and exercise were not enough to lower your cholesterol sufficiently; is that right?

A. Yeah.

basis of your knowledge of statins. I think your testimony earlier was that you had read --

THE WITNESS: Yeah, I read it all.

MR. FOLDENAUER: -- the information that came with the product.

THE WITNESS: Right.

MR. FOLDENAUER: So that would be on your list then?

THE WITNESS: It should be. From Longs drugstore, they print out everything; same as Rite-Aid.

BY MS. SON:

Q. Okay. Let's go over this one more time. The basis of your knowledge of statins, those include magazines in your doctors' offices, conversations with doctors, advertisements, and various labels that came with your prescription?

A. Correct.

Q. Anything else?

A. No.

Q. In terms of your conversation with your doctors, who did you discuss statins with, which doctors?

A. Dr. Levine. I told him anything you take into your system, that affects your liver and kidneys. Common sense.

A. No, he never told me.
Q. He never indicated to you what he was thinking about what statins would do or the side effects of statins?
A. No.
Q. Now, did he discuss with you the status of other patients at all?
A. No.
Q. So earlier when you had testified that if he had known about the side effects that other people were going through, you don't really know if there were other people that he was treating who had side effects?
A. That's correct.
Q. All right. Besides Dr. Levine, were there any other doctors with whom you discussed statins?
A. No.
Q. How about Dr. Deemer?
A. No.
Q. You also mentioned advertisements, advertisements about statins in general. You mentioned the Lipitor ads. Did you see those ads on TV?
A. Yeah, just the other night on television.
Q. Besides the Lipitor ad on TV, have you seen any statin ads anywhere? TV? Radio? Print?
A. Just the Lipitor.

MR. FOLDENAUER: Wait, wait, wait. Misstates the witness's testimony. She's saying have you ever seen any statin ads -- TV, radio -- and that includes the Baycol.

THE WITNESS: Oh, I'm talking about now, this moment. That isn't what you said.

BY MS. SON:

Q. That's not my question. My question, Mr. Elich, is: Have you ever seen an ad about statins, advertising statins?

A. Yes.

Q. Can you tell me which statins were advertised?

A. At that time Bayer was pushing Baycol.

Q. So have you seen a Baycol ad?

A. Well, years, years back.

Q. Okay. What medium did you see this advertisement in?

A. Television and magazines, various magazines.

Q. Do you remember what years those were?

A. No, I don't.

Q. "Years back," before you were taking Baycol or during your Baycol use?

A. I don't recall.

Q. Okay. In terms of the magazine ads, which magazines are you referring to?

A. What is it? Men's something. I forget what it is. It's a man's magazine.
Q. A men's magazine?
A. Yeah.
Q. Where did you see this magazine? Like did you get a subscription to the magazine? Did you purchase it?
A. In the barber shop.
Q. In the barber shop?
A. Yeah.
Q. Do you remember when that was?
A. Oh, no.
Q. Did you see it one time or more than one time?
A. I saw it more than one time. Every time I'd go to the barber shop, I was looking at various magazines. They advertised.
Q. Outside of the barber shop, did you see an advertisement for Baycol anywhere else?
A. Mailers, mailers.
Q. "Mailers," meaning?
A. In the mail. Direct mail.
Q. I understand. But you're saying like coupons, or what are you saying?
A. Remember the magazine -- I believe there's one called "Remedy."

Q. There's a magazine called "Remedy" in which you saw an advertisement for Baycol?
A. Oh, years ago.
Q. Anything else?
A. No.
MR. FOLDENAUER: Television?
THE WITNESS: Oh, yeah. I saw it on television. I already told her on TV.
BY MS. SON:
Q. Approximately how many times did you see an advertisement on television?
A. I don't recall.
Q. Do you remember what the advertisements on television said?
A. No. If I said, I'd be guessing. Huh-uh.
Q. How about the magazines or the mailers? Do you remember what those said?
A. It would be repetitious. Said the same thing over and over, "To reduce cholesterol. See your doctor." That's it. No, it was very short.
Q. Is that the precise language that you remember, "To reduce your cholesterol. See your doctor"?
A. Pretty close.
Q. Were there any representations to you about

whether Baycol would work to lower your cholesterol?
A. There was no guarantee.
Q. Were there any guarantees that --
MR. FOLDENAUER: Wait, wait, wait. Just so you're clear here, were there any representations that Baycol would work to lower your cholesterol?
THE WITNESS: Cholesterol.
MR. FOLDENAUER: Wasn't the whole advertising campaign that it would lower your cholesterol?
THE WITNESS: Yeah, that it would.
MR. FOLDENAUER: Was that your understanding?
THE WITNESS: Yeah, 28 to 30 percent in those days.
MR. FOLDENAUER: So the answer is yes, right?
THE WITNESS: Yes.
BY MS. SON:
Q. Did you ever see an advertisement or any representation by Bayer ever that Baycol would guarantee that your cholesterol would be lower if you took Baycol?
A. No, I don't think guarantee.
Q. Did you ever see any representation anywhere that guaranteed that Baycol would not have any side effects?
A. No.
Q. Did anyone -- any of your doctors, anybody --

ever represent to you that there would be no side effects to taking Baycol?

A. At the time I was taking it, nothing was stated that it was going to have side effects.

Q. Okay, but that's a different answer.

I asked you did anybody guarantee to you --

A. No.

Q. -- that Baycol would not have side effects?

A. No.

Q. Okay. So you mentioned the TV ads, and the magazine ads, and the mailers about Baycol. Were there any other ads that you saw that pertained to any statin, not just Baycol?

A. No, the only one I ever saw, now more recently, Lipitor.

Q. Okay. And just to be clear, in terms of the Baycol ads, the only ones you saw were the ones on TV, the barber shop magazine, and the mailers; is that correct?

A. Yeah.

Q. And you do not recall whether you saw these ads before you started taking Baycol or during; is that correct?

A. I don't recall.

MR. FOLDENAUER: But it was while the product

memory at all as to whether you had any side effects from Lipitor?

A. I don't recall.

Q. Because earlier you said that you didn't have any problems with Lipitor.

MR. FOLDENAUER: No pain, right? Is that what you meant, no pain?

THE WITNESS: Yeah, no pain. I didn't have any pain.

BY MS. SON:

Q. But did you have any dizziness from the Lipitor?

A. I don't recall.

Q. Now, also, this document notes that the samples of Baycol were given on this date in 1998. Does this document refresh your memory as to when you first started taking Baycol?

A. I don't remember that. It's too long ago.

Q. So once you started taking Baycol, was there ever a period of time where you stopped taking Baycol, or did you take it continuously until --

A. Continuously until that date.

Q. Until August 7th, 2001?

A. See, here's a brand-new one, never used. Still the cotton is in there. That's the day they

pulled it off, 8/7/2001.
Q. So from the date you first started taking Baycol, you never went off Baycol, you took it continuously all the way until 2001?
A. Correct.
Q. Do you remember stopping your Baycol use and taking Lipitor for about a period of two months in 1999?
A. I didn't go back on Lipitor. I had it, but I didn't take it. That was a carryover.
MS. SON: I have another medical record that I'm going to mark as Exhibit 6.
(Defendants' Exhibit No. 6 was marked for identification.)
BY MS. SON:
Q. This is a record of a phone call from you, Mr. Elich, to Dr. Levine's office. If you look at the top of the document, it says your name, your age, and the date of the document, which is June 25, 1999.
Do you see it, the On-Call Record? Do you see where it says, "On-Call Record" there with your name and date?
A. Yes.
Q. Now, under "Subjective:" it says, "Patient discontinued Lipitor due to side effects of muscle tightness and cramps. Was on Baycol without side

A. No.
Q. So you took the Lipitor all the way until the time you took Baycol?
A. Right.
Q. Did you receive any written materials about Lipitor when you started taking it?
A. Just a printout sheet, whatever is given to me at the drugstore. That's it.
Q. You don't remember what that said?
A. No. It doesn't interest me.
Q. So as you sit here today, is it your testimony that you didn't experience any dizziness from your Lipitor use during your Lipitor use?
A. A headache but never -- no dizziness.
Q. So you did experience headache?
A. Yeah, but it would go away.
Q. When did those headaches first start after you started taking the Lipitor?
A. Towards the end, before I quit Lipitor.
Q. How long did the headaches last?
A. Maybe three, four minutes. That's all.
Q. Three or four minutes in the day?
A. Yeah.
Q. And how many days did that continue?
A. Oh, an occurrence was like maybe once, twice a

MR. FOLDENAUER: He doesn't recall when he saw the ads.

THE WITNESS: I don't remember. I don't recall.

BY MS. SON:

Q. So you recall seeing Baycol ads before?

A. I don't recall, I'm telling you.

Q. So your testimony is that you may or may not have seen advertisements about Baycol before Dr. Levine first prescribed or gave samples of Baycol to you; is that correct?

A. That's correct.

Q. So you don't know if you saw ads about Baycol before you were prescribed Baycol?

A. I can't give you a day, time, or place.

MR. FOLDENAUER: He'll be able to refresh his recollection on that with some documents if you have any of the advertisements. We have a television, if you want to show commercials.

MS. SON: Okay. Counsel, as you know, this is my deposition, and I'm entitled to ask my questions. So I'd appreciate it, if you have questions, obviously you can save it to the end.

MR. FOLDENAUER: I don't have any questions.

label warning?
A. No, not on their bottle.
Q. Besides -- so you saw something that came on your bottles; correct?
A. Yeah, "Do not take with grapefruit juice." It's right on there. I don't take grapefruit juice too much.
MR. FOLDENAUER: Is that what you meant by "label warning"?
THE WITNESS: Is that what you mean?
MS. SON: No, no. That's not what I meant. Hang on. Let me just --
MR. FOLDENAUER: Because I think that's the only label warning on there.
BY MS. SON:
Q. Besides the warnings that came actually stuck on your bottle, did you ever see a package insert that came with your Baycol prescription, or did you ever see a page of the "Physician's Desk Reference"?
A. No. The only thing on that was the printout sheet, similar to like this, only smaller, and that was it, stuffed in the papers with the bag.
MR. FOLDENAUER: It came from the pharmacy with the product?
THE WITNESS: Longs drugstore.

Q. Mr. Elich, this is your prescription. It looks like it's a sticker. It says, "Joe Elich," August 7, 2001. It says, "Possible side effects: Headache, nausea, diarrhea, stomach pain, dizziness, arthritis, sore throat. Report promptly chest pain, muscle weakness or pain."
Do you see that?
A. Yellowing of the eyes and all that.
Q. Right, right.
A. I see it.
Q. So did you receive this label with your Baycol prescription?
A. No. That's the one I'm telling you. I never received a label. Here's how they do it. Put this in a little paper bag, and they staple this to the outside with your receipt.
Q. And you got that every time you filled your prescription for Baycol?
A. Yes.
Q. And this is what it said?
A. Yeah, that's what I get.
Q. Did you ever skip taking Baycol?
A. No. Any medication, I don't skip.
Q. Now, did you experience any side effects while you were taking Baycol?

A. Right away I didn't, but as you consume more and more of the product over a period of time, residual buildup, yes.
Q. Where did you hear about the residual buildup?
A. Myself.
Q. Okay. So you're saying that you felt that there was a residual buildup?
A. The only thing is the process of elimination; eliminated certain thyroid pills, everything, just find out what's causing this. Simple elimination of products. I stayed with the Baycol, and boy that's what did it. And I called Dr. Levine, and he said come on in.
Q. Let's go back. While you were taking Baycol, you said that you experienced side effects. What side effects did you experience?
A. Pain in the --
Q. Hang on. Can you just make me a list and then we'll go through them.
A. Okay. Back pain, leg pain, calf pain, and dizziness, weakness, really.
Q. So all the side effects that you experienced while taking Baycol include back pain, leg pain, calf pain, dizziness, and weakness; is that correct?
A. Correct.

MR. FOLDENAUER: Didn't you testify to flu symptoms? You thought you had the flu?

THE WITNESS: Yeah. Well, she knows that.

MR. FOLDENAUER: Would you add that to the list? This is your list. This is the universe now.

THE WITNESS: Okay. Like the flu, I thought it was the flu, but it wasn't.

BY MS. SON:

Q. When is the first time you experienced back pain while you were taking Baycol?

A. Started coming on, I think it was the latter part of 2000. I don't keep notes on that, so I don't know.

Q. Okay. I understand. So the back pain, it was at the end of 2000. Was it a gradual onset or was it sudden?

A. No, no. Gradual.

Q. What part of your back?

A. The center of the back.

Q. It was a pain, you said?

A. Yes.

Q. Can you describe the pain for me?

A. It wasn't at first excruciating pain, but after that, it started getting bad, and that's when I called Dr. Levine and told him.


d8f7536b-8160-4cfa-9c89-8a4088144844

Kipler, Adler, Jaramillo --
Q. Dana, Levine, Frakes, and Rogers, right?
A. Yeah.
Q. Did Dr. Levine ever tell you while you were taking Baycol that Baycol --
A. Yeah, but look at the date.
Q. September, '98?
A. Yeah.
Q. So did Dr. Levine tell you -- do you remember Dr. Levine telling you that Baycol was lowering your cholesterol?
A. No. He says, "You're on target." That's it. I don't see these.
Q. When he said, "You're on target," what did you take that to mean?
A. It was an improvement.
Q. You're on target in terms of your cholesterol goals? Is that how you took it to mean?
A. I guess so.
Q. I mean, you don't have to guess. Is that how you understood what he said?
A. Yeah, that's right. And after that, I know it went whack all through.
Q. What do you mean, "After that, it went whack all through"? What does that mean?

BY MS. SON:
Q. Mr. Elich, do you have an understanding of what you're trying to get in this lawsuit?
A. I really don't know.
Q. You don't know. Are you seeking money?
A. Compensation, yes.
Q. Compensation for what?
A. Pain and suffering. I'm the one that has to suffer.
Q. Pain and suffering from what?
A. Baycol.
Q. From your physical injury?
A. No, from the Baycol, the poison.
Q. Because Baycol -- okay. I'm just trying to clarify what is the pain and suffering that you felt? Are you talking about your physical injuries when you're saying "pain and suffering"?
A. Pertain to physical injuries like what?
Q. Like the side effects that you were talking about.
A. The side effects, my back pains, calves, leg pains, all that.
Q. So you're trying to get --
A. And dizziness and weakness.
Q. So you want to be compensated for pain and



d8f7536b-8160-4cfa-9c89-8a4088144844

suffering from your side effects that you mentioned; including headache, weakness, calf pain, back pain, leg pain. Is that correct?

A. That's right.

Q. Is there any other compensation that you're looking for? For instance --

MR. FOLDENAUER: On behalf of the class, she's talking about. You can answer about that.

BY MS. SON:

Q. Are you looking to recover any other money?

A. On the class action?

Q. In this lawsuit, Mr. Elich.

THE WITNESS: Does that pertain?

MR. FOLDENAUER: That's what she's asking for, the class action.

THE WITNESS: Whatever goes for me, it goes for the rest, doesn't it?

BY MS. SON:

Q. Okay. Are you, for instance, looking to get a refund of your Baycol, for the amount that you spent on Baycol?

MR. FOLDENAUER: If you know. I mean this is an area where it's very complex. So she's entitled to ask, you got to give your answer. But I still say this calls for speculation from a lay person representing a

consumer product.

BY MS. SON:

Q. I'm just asking what your understanding is.

A. I'll leave it to my attorney.

Q. I'm trying to probe what your understanding is, Mr. Elich. I know that your attorney knows. Okay? I know that your attorney knows.

I'm asking you what your understanding is. It doesn't have to be legally correct. I'm asking you what your understanding is.

MR. FOLDENAUER: As to what?

BY MS. SON:

Q. As to whether you're seeking to recover a refund for the purchase price of Baycol.

A. I'm not looking for a refund on this. I'm looking for whatever the court decides.

Q. How about medical bills? Are you looking to recover medical bills?

A. I'll still leave it to whatever my attorney advises me.

Q. I understand, but what is your understanding? I understand that you're relying on your attorney. I'm asking you what your understanding is.

A. Any medical claims or anything pertains in the lawsuit as against Bayer Corporation. They're liable.

correct?
MR. FOLDENAUER: Misstates the witness's testimony. Argumentative. He didn't say that. He did not say that, Counsel.
BY MS. SON:
Q. Mr. Elich, do you feel you can adequately represent everyone in the United States who took Baycol?
A. California.
Q. Okay. You have to answer the question as a "yes" or a "no."
A. No.
MR. FOLDENAUER: What do you mean by "adequately"? It's vague, ambiguous, and unintelligible. You have attached no meaning to "adequately," so there is my objection.
BY MS. SON:
Q. Mr. Elich do you understand what I mean by "adequate"?
A. The definition of adequate. You tell me now.
Q. What is your understanding of the word "adequate"?
A. That it's okay, equal.
Q. Do you think you can -- you are okay or sufficient?
A. Sufficient to handle it for California.

I'm going to strike and rephrase.
Do you still want to recover compensation for your pain and suffering from the physical side effects that you suffered as a result of your Baycol use?
You don't have to look at your attorney. You can answer the question.
A. Well, he's my attorney.
MR. FOLDENAUER: If he wants to.
THE WITNESS: Sure, that's why I'm going through this.
MR. FOLDENAUER: You asked him if he wanted to recover.
THE WITNESS: I wouldn't be here.
BY MS. SON:
Q. And do you, after having read the complaint, do you see that that is not a Prayer that you are seeking from this court?
A. Not a Prayer? Seeking it from Bayer Corporation.
Q. Right. Well, that's what I mean. That in your complaint, your complaint is what you have filed with the court --
A. Right.
Q. -- to say this is what I want to get back from -- this is what I want to get from Bayer.

# Exhibit C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOSEPH ELICH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. District of |
| | ) | Minnesota, MDL 1431, |
| BAYER CORPORATION, et al., | ) | Case No. 02-0434 |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF ANDREW R. DEEMER, M.D., taken on behalf of Defendant Bayer Corporation, at 3998 Vista Way, Suite C-200, Oceanside, California, commencing at 1:10 p.m., Wednesday, July 26, 2006, before Patricia P. MacDonell, a Certified Shorthand Reporter within and for the State of California, pursuant to Subpoena.

-oOo-

A P P E A R A N C E S

FOR THE PLAINTIFFS:

FRANTZ, TOWNSEND & FOLDENAUER LLP
BY: SEAN M. FOLDENAUER
Attorney at Law
600 West Broadway, Suite 1200
San Diego, California 92101
(619) 233-5945

FOR THE DEFENDANT BAYER CORPORATION:

SIDLEY AUSTIN LLP
BY: ALYCIA A. DEGEN
Attorney at Law
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
(213) 896-6682

# I N D E X

WITNESS: ANDREW R. DEEMER, M.D.



| EXAMINATION BY | PAGE |
|---|---|
| Ms. Degen | 4, 45, 54 |
| Mr. Foldenauer | 30, 49 |



## E X H I B I T S



| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena issued for Andrew R. Deemer, M.D. | 4 |
| 2 | Curriculum vitae | 4 |
| 3 | Patient chart for Joseph Elich maintained by Dr. Deemer | 4 |
| 4 | Progress Note, dated Aug 14, 2001 at the top | 4 |



INFORMATION TO BE SUPPLIED

(None)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

(None)



9063d3c9-042b-4639-a9a2-f3d8234ea4d8

WEDNESDAY, JULY 26, 2006, OCEANSIDE, CALIFORNIA
1:10 P.M.
* * *

(At which time, Defendant's Exhibit Numbers 1, 2, 3 and 4 were marked for identification.)

ANDREW R. DEEMER, M.D.,
having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. DEGEN:

Q. Would you please state your full name for the record.
A. Andrew R. Deemer.
Q. Have you ever had your deposition taken before, Dr. Deemer?
A. Yes.
Q. Approximately how many times?
A. Maybe 10.
Q. Okay. Have any of those depositions related to a patient's use of a statin?
A. No.

Q. Have any of them related to hyperlipidemia?
A. No.
Q. You seem to be experienced at this, but I'm going to run through just a couple of ground rules to make this go smoothly.
A. Good.
Q. I will be asking you a number of questions, and I'll ask that you answer them to the best of your ability. If you don't understand or don't hear one of my questions, please let me know and I will try to rephrase it or repeat it. Will you do that?
A. I will.
Q. Because we have a court reporter here, it's important that all of your responses be made audibly, so no shaking your head or nodding your head.
A. Okay.
Q. Thank you.
It's also important that you wait until I get my question all the way out before you start to answer, even if you think you know where I'm going.
A. Okay.
Q. And I will wait to let you finish your response before I move on to the next question.
A. Okay.
Q. If at any point you need to take a break,

just let us know. This is not a marathon.
A. Okay.
Q. Now, I see you have a folder of records in front of you. Do those records relate to Joseph Elich?
A. Yes.
Q. Do you know Joseph Elich?
A. Only to the extent that, as indicated in these records, I've seen him as a patient.
Q. Okay. When was the last time you saw Mr. Elich as a patient?
A. June 16th, 2005.
Q. And when was the first time you saw Mr. Elich as a patient?
A. July 11th, 2001.
Q. Okay. We have previously marked this as Exhibit 3, which for reference is Bates numbers ARD000001jre through 13jre, and I'll put that exhibit in front of you.
And we have also previously marked as exhibit --
A. It's behind this piece of tape. That piece of paper is behind here, because when we update the information, we don't throw the old one away. We keep it and we just hide it.

Q. You're referring to an old Patient Information sheet?

A. Yes. That page is this page.

Q. Okay, great.

MR. FOLDENAUER: When you say they're previously marked, are you referring to the deposition of Joseph Elich?

MS. DEGEN: The deposition of Dr. Deemer. The court reporter has already marked these as exhibits.

MR. FOLDENAUER: Oh, all right.

Q. BY MS. DEGEN: We have also marked as Exhibit 4 -- please go back a second.

Exhibit 3, do these appear to be a copy of at least some of your records for your treatment of Joseph Elich?

A. Yes, most of it. This portion that starts "CT low dose lung screening" and "CT coronary calcium scoring screening" were actually ordered by a different physician for different reasons. Those aren't part of my personal interaction with Mr. Elich.

Q. These are materials that you have in your file, however?

A. Yes.

Q. We also have what we've marked as Exhibit 4.

This is another page from your records of Joseph Elich?

A. It is.

Q. And I see here there's a date at the top that says August 14th, 2001, and a few more entries, ending with one at the bottom of June 16th, 2005.

A. Correct.

Q. Okay. Doctor, did you do anything to prepare for this deposition today?

A. I reviewed this chart.

Q. Had you met Mr. Foldenauer before today?

A. No.

Q. Have you spoken with Mr. Foldenauer or anyone from his office prior to today?

A. No.

Q. Dr. Deemer, I'm showing you what's been marked as Exhibit 2 to your deposition. Is this a copy of your curriculum vitae?

A. Yes.

Q. Could you describe briefly for me your education and training beginning with medical school?

A. I went to medical school and graduated from medical school at University of California, San Diego. I graduated in 1984. I then went to Boston University for both my internship and general

surgery residency, completing that in 1989.
I then went to Long Beach Surgical Group and did a vascular surgery fellowship with them for one year, and then after completing that fellowship, moved here and have been in practice at this location since then.
Q. Are you board certified?
A. Yes, ma'am.
Q. In what areas?
A. General and vascular surgery.
Q. And I assume you are licensed to practice in the state of California?
A. Correct.
Q. Are you licensed in any other states?
A. No.
Q. After your fellowship with Long Beach surgery group, where did you practice after that?
A. Here.
Q. Here? Okay.
Can you explain to me what vascular surgery is?
A. The diagnosis and treatment of vascular pathology, mostly arterial but some venous. The surgical portion of it involves cleaning out arteries or bypassing arteries. We do some correction of vein

problems as well.

Q. What are some of the more common conditions that you treat in your practice?

A. Arterial blockages where the artery has become occluded with atherosclerosis, is the most common, and that occurs most commonly, or at least in terms of locations of clinical significance, in the carotid arteries in the neck and the leg arteries or arteries that supply blood to the legs.

Q. In your practice do you have occasion to prescribe medications to patients?

A. Yes.

Q. Along with these medications, would it be fair to say that the prescription medications that you prescribe all have some risk of side effects associated with them?

A. Yes.

Q. Do you ever have occasion to prescribe medications to treat high cholesterol?

A. Not very frequently. Infrequently.

Q. For your patients who have high cholesterol, do they usually have another doctor to follow them for that?

A. I don't make a recommendation that they go back to their primary care physician to have their

high cholesterol or LDL levels treated, but I don't initiate it myself, usually.

Q. Are you familiar with the statin class of drugs?

A. In general.

Q. Have you ever prescribed a statin?

A. I don't prescribe those medications very often at all.

Q. Are you familiar with the potential side effects of statins?

A. Again, in general, I am.

Q. Okay. Can you describe for me what your understanding of the side effects of statins would be?

A. The side effects that have come to the forefront, at least in terms of common knowledge, I think, have to do with hepatotoxicity and muscle toxicity.

Q. And by hepatotoxicity, is that referring to liver function?

A. Yes.

Q. You say muscle toxicity. Are you aware of what symptoms might be associated with muscle toxicity?

A. I've never treated a person with that -- let me rephrase that.

To the best of my knowledge, the most common symptoms relating to muscle toxicity is pain; however, I believe that it can go on to even muscular injury in the more severe cases.

Q. Have you ever had a patient who you believed experienced side effects from a statin?

A. Yes.

Q. What side effects did that patient or those patients experience?

A. I've never been the treating physician for those problems, but I've had a number of patients who have told me that they had side effects from statin medications and had to stop them, or when I asked them about medications they were allergic or intolerant to, they would give the statin class of medications as a drug that they had had a side effect from in the past.

Q. Have you ever diagnosed a patient as having some sort of statin-related side effect?

A. No.

Q. Are you familiar with any potential health risks associated with high cholesterol?

A. Atherosclerosis is the one that I deal with every day.

Q. Can you describe in layman's terms what

atherosclerosis is?
A. The common phrase that's used is hardening of the arteries. It's a buildup of material on the inside lining of the arteries. It occurs over a period of time and has a number of different etiologic factors including lipid levels in the blood.
Q. Is heart attack a risk of atherosclerosis?
A. The most common cause of heart attack is obstruction of coronary arteries, which is one manifestation of atherosclerosis.
Q. Is stroke also a potential manifestation?
A. Yes. Atherosclerotic disease of the vessels supplying the brain is also -- it doesn't make up quite as high a percentage as the relationship between coronary disease and heart attack, but it is one of the more common reasons for strokes.
Q. You stated earlier, I believe, the first time you saw Mr. Elich was in July of 2001; correct?
A. Correct.
Q. How did Mr. Elich come to be treated by you?
A. He was referred to me by Dr. Neil Levine.
Q. Are you and Dr. Levine associated in practice in any way?
A. No.
Q. Had Dr. Levine referred patients to you in

the past?
A. Yes.
Q. When Mr. Elich came to see you on July 11th of 2001, what was the purpose of his visit? What was he complaining about?
A. His main complaint was leg pain. He had -- before seeing me, he had seen Dr. Levine for evaluation of that symptom and had had an arterial study that I think is in those documents you have marked, but let me bring it out for you.
The study I'm referring to is the color duplex doppler ultrasound bilateral lower extremity.
Q. Okay. And referring you to what's been previously marked as Exhibit 3, and looking at Bates pages ARD000006 through 7jre, is this the study that you're referring to?
A. Correct.
Q. Okay.
A. Based on that study, Dr. Levine felt that there was evidence of atherosclerosis of leg arteries causing his symptoms. His recommendation was to have a consultation with a vascular surgeon, and that's how he came to see me.
Q. We can refer you back to Exhibit 3, and looking at what's been Bates labeled ARD000003jre,

are these your notes of that July 11, 2001 visit of Mr. Elich?

A. Yes.

Q. Okay. And you said he was complaining primarily of leg pain?

A. Yes.

Q. Was the pain in one leg or both legs?

A. Both legs, but the right seemed to be more affected than the left.

Q. Doctor, if we can just start at the top of this record. And I hate to ask you to do this, but I'm having a little trouble reading it. I want to make sure that I understand what all of your notes mean here.

Under the date, the first line, it looks like there's a 69. Can you just walk me through the record?

A. Yes. The first line is his weight, 168 pounds. Blood pressure 132 over 80 in the right arm. I made a note of the correct spelling of his name, which is not correct at the top.

He's a 69-year-old male. Two months ago (May 18 through 20) -- it's inferred here that's when his leg pain started, although I didn't write it down -- it occurred at the time when he was going up and down

a ladder. Since then -- and, again, this is inferred -- that he has right more than left calf pain that he described as, quote, "tightened up," end quote.

He would have pain two times each way. I -- it's clearer in my letter, but I think that meant two times -- he would have to get pain enough to stop two times along a certain length that he walked.

The next line says pin/plates right ankle 1990. That refers to a previous orthopedic procedure. The next line says, Cardiac angioplasty (Whittier). Next line says, Nitroglycerin Q. two months, which means he uses it approximately every two months or needs it every two months. He had an open-air MRI.

Q. And, Doctor, you had referred a moment ago to a letter. In Exhibit 3, this is ARD000012 to 13jre, is this the letter you're referring to?

A. Yes.

Q. This is a letter dated July 11, 2001 from you to Dr. Neil Levine?

A. Correct.

Q. Okay. Does this letter essentially summarize your observations and findings from your examination on July 11th, 2001?

A. Correct.

Q. Okay. I'm looking at --

MR. FOLDENAUER: Could we have a clear record here and just let him finish it? Because I can't read the rest of it, and if I have to go back and start over, it will be a weird transcript.

MS. DEGEN: Sure.

MR. FOLDENAUER: Thank you.

THE WITNESS: The next line -- that was the line I was on before -- he had an open-air MRI, looks like it's upper extremity for -- something pain. Dislocated left -- I want to say shoulder, and something left elbow (old).

Below that, although it's not indicated as such, are the notes from the physical examination. It says, Right carotid bruit. It says, Negative AAA, which, to me, means he did not have a palpable abdominal aortic aneurysm. He had a two plus femoral pulses with left BR, which is a bruit at the left femoral position.

Next line says, Right one plus DP/PT, which stands for dorsalis pedis and posterior tibial pulses, and the upper left side, one plus DP.

Plan. The plan was for a trial of a medication to treat his claudication. There's an arrow pointing to the next step, which would be plus

minus angio/angioplasty, and that was more clearly printed in the letter.

Q. BY MS. DEGEN: Okay. And, Doctor, looking back up towards the top third, over here to the right there's some notes.

A. There's three things there. The one says SM 1 ppd, which stands for smokes one pack of cigarettes per day. Baycol, Levoxyl, L-e-v-o-x-y-l, were the medications he was on.

Q. Those are the medications that the patient told you he was taking at that time?

A. That's correct.

Q. Upon your examination of Mr. Elich on July 11th, 2001, can you describe for me what your findings were with respect to Mr. Elich?

A. Can you say it one more time?

Q. Sure. Can you explain to me what your findings were with respect to Mr. Elich's medical condition on July 11th, 2001?

A. With reference to the specific problem that he had presented with to me, my impression was that he had, beginning about two months prior, started to have leg pain with exertion. It started with a fairly heavy exertion; that is, going up and down the ladder, but now was even with walking. I believe I wrote 100

to 150 feet he would get pain in the calf muscles on both sides, right more so than left.

His physical examination was not completely normal. Although he did have pulses I could feel at the ankle on both sides, they were less than the normal quality of pulse that you would expect with someone with no arterial disease. That, in combination with the duplex study that had already been done prior to him coming to my office, my impression was that he had leg muscle pain related to atherosclerosis, and we started him on therapy for that.

Q. Is peripheral vascular disease essentially the same thing as atherosclerosis?

A. It's one form of it, yes.

Q. And I note in your July 11th letter to Dr. Levine that you referred to peripheral vascular disease. When you referred to that there, you're referring to this atherosclerosis that you just described?

A. Correct.

Q. What are some of the symptoms that a patient with peripheral vascular disease might experience?

A. Specifically in the legs, are we talking?

Q. Let me back up a second.

Can you describe for me -- you said peripheral vascular disease is one form of atherosclerosis. Can you describe for me a little bit more about what peripheral vascular disease is?

A. In general, in the broader topic of atherosclerosis, it can present in a number of different places. The heart is a good example of a coronary artery disease. That's not peripheral; that's central. So when we talk about peripheral vascular disease, we usually talk about atherosclerosis affecting arteries that go to the arms or legs or head.

Q. For someone with Mr. Elich's form of peripheral vascular disease, what are some of the symptoms with someone with that form of disease might experience?

A. Depends on the level of the disease, but typically blockages or narrowing of arteries due to atherosclerosis cause symptoms downstream of the area of the blockage. Those symptoms can be related to muscular pain, especially with exercise. With more severe blockages there can be pain without exercise, and that pain can be not only in the muscles but it can be in the skin and bone.

In the most severe situations, there's

actually not enough profusion to keep tissue alive, and people can have toes that die or legs that go bad to the point where they're not salvageable.

Q. And that's from the lack of circulation?

A. Correct.

Q. Okay. Are there factors that can aggravate the symptoms a patient experiences with peripheral vascular disease?

A. You mean at a given point in time?

Q. Yes.

A. Yes. The most common ones would be anemia and low oxygen supply. For example, people with lung disease, it's not only that they're not getting enough blood, but the blood they're getting either doesn't have enough red cells or oxygen, so it aggravates the symptoms during that period of time.

Q. Can smoking have any affect on a patient's symptoms?

A. In a broader sense -- not in a given point in time, but in a broader sense of time, smoking frequently accelerates peripheral vascular disease.

Q. And why does it do that?

A. That's a good question.

Q. In layman's terms.

A. That's a good question, and actually the

scientific answer to that is not really well-known and it combines with other factors. For example, in the Oriental population it doesn't have as much of an influence, so there is a genetic issue as well. But, clearly, people that smoke get more atherosclerosis as a population and get it faster than people that don't smoke.

Q. Peripheral vascular disease, is that something that is -- that's a risk of having high cholesterol; is that correct?

A. High cholesterol is one of the risk factors for causing atherosclerosis.

Q. Doctor, I'm referring to your July 11, 2001 letter to Dr. Levine, and you note in the letter that you had a long discussion with Mr. Elich and his wife about peripheral vascular disease. Do you recall what you discussed with them?

A. Not specifically, but I've had these type of discussions many times, so I could give you an idea of what I would usually do, but I can't remember this specific conversation.

Q. What's the usual discussion that you'll have with a patient?

A. Typically, I review the anatomy involved for that particular patient, what vessels are involved and

how that relates to the symptoms they're having. And then I give some options for treatment or an algorithm for treating over time.

Risk management is also part of the discussion, and that includes smoking cessation; it includes control of dietary factors, hypercholesterol anemia, those issues. Although it may not be addressed specifically, therapeutically, they're discussed with each patient as appropriate.

Q. Do you have any reason to think that your discussion with Mr. Elich and his wife did not follow your usual practice?

A. It probably was as I outlined.

Q. Did you recommend surgery for Mr. Elich?

A. No.

Q. What did you recommend for him?

A. We started -- I gave him a prescription for a medication that decreases blood viscosity. His anatomy, based on the duplex study, was that he had stenosis; that is, he had narrowing of the arteries, not complete occlusions, and medications that decrease blood viscosity can be helpful for people with that scenario.

Q. Is this the Pletal that you described?

A. Yes.

Q. Is Pletal a medication that starts giving symptom relief right away or is it one that a patient usually has to take for a little while before they start feeling relief?

A. Typically, it takes four to six weeks for a demonstrable improvement in symptoms.

Q. Do you know whether the Pletal helped with Mr. Elich's symptoms?

A. It appeared to, and I'm basing this on the August 14th, 2001 note. When I saw him in follow-up, this would have been a month later, he did seem to have improved symptoms.

Q. Doctor, looking through your file, I note a record of a bilateral carotid duplex ultrasound on July 25th, 2001. On Exhibit 3, just for reference, it's ARD000004 through 05jre. Is this a test that you ordered for Mr. Elich?

A. Yes.

Q. Can you describe for me what this test is and why you ordered it?

A. The test is a -- it uses -- it's called a duplex. It has two tests that are done simultaneously. One is an ultrasound visualization of the artery and the other is a doppler measurement of arterial flow velocity; speed of blood flow.

Using those two pieces of information, you can make a -- you can describe how the artery looks and how it's functioning.

Q. Okay. Why did you prescribe this particular test for Mr. Elich?

A. My initial meeting with him on July 11th, 2001, I noted he had a right carotid bruit; that is, he had a sound I could hear with a stethoscope over his right carotid artery.

Q. Is that sound something that would suggest the potential for some sort of atherosclerosis in the artery?

A. That sound indicates that the blood flow isn't completely smooth. You can't tell just with a stethoscope how much it's narrowed or even that it is a narrowing that's causing the flow to be turbulent enough that you can hear it. That's why this test is a good way to evaluate that artery when you hear a sound like that.

Q. What did you find in this test?

A. It was only mildly abnormal. There was a mild degree of atherosclerosis in both arteries but not enough that it would put him at risk for having a stroke and not enough that it would require any kind of intervention.

Q. When you saw Mr. Elich on August 14th, 2001, did you recommend any further treatment to him?

A. No. My impression was that he was doing -- his symptoms had improved. That office visit, for whatever reason, I didn't have the carotid report, and it says, "Plan: Check carotid," which means find the report. And then the next day there's a note that says, "Called with carotid ultrasound report." So I apparently called him at home once I received a copy of the report.

Q. Doctor, looking at your records, and I'm referring to what's been marked as Exhibit 4 at this point, there are two entries for December 28th of 2001, noting that the patient had called with chest pain. Did you speak to the patient on December 28th, 2001?

A. I don't recall. I can say that's not my handwriting. That's the handwriting of the secretary that worked for us at that time, but I don't recall that I spoke personally to him at that time.

Q. Okay. Then after August 14th, 2001, is the next time you saw Mr. Elich this June 16th, 2005 meeting?

A. Correct.

Q. Okay. And can you walk us through what your

record says under the June 16th, 2005?

A. I'll start with the entries on the left side -- let me go back a second.

It says, Leg pain probably secondary to Baycol. On the far left it says, Reducible right inguinal hernia and abdomen negative, which means the abdominal examination was benign. Those are related to the physical examination.

And the second line towards the middle, it says, RIH, right inguinal hernia. Lump times five to six months; intermittent. Little pain. Same size. To my understanding, that would mean that's the same size over the five- to six-month period described above.

It says -- this is a social note -- helps daughter is a nurse, daughter R.N. I think that's what it says. Right carotid bruit. I can't read that, to be honest with you.

Q. Okay.

A. I'd have to guess and I don't want to do that.

Q. That's fine.

A. The next line says -- I think it says, Wife is having chemotherapy in, I think it says, Los Angeles, right lung, meaning that her pathology

was in the right lung.

On the far right it says, Diabetes mellitus, D.M. CAD, which is coronary disease. Stints, Spiegel -- that would refer to Dr. Spiegel -- three years ago.

Plan: Right inguinal hernia repair in July after wife has her surgery.

Q. The leg pain probably secondary to Baycol, is that something that the patient came in and was complaining about on that day?

A. My recollection -- this is a year ago, but my best recollection of why I wrote that is that I asked him about his leg pain, and his answer was that the leg pain had gone away after he had stopped taking the Baycol and that lead him to the conclusion that Baycol was the cause of it and it was no longer an issue. But I don't remember the specifics of my conversation with him.

Q. Did you ever diagnose Mr. Elich with leg pain secondary to Baycol?

A. No.

Q. In your examination of Mr. Elich on July 11th, 2001, was there anything in your examination that suggested to you that his leg pain was secondary to Baycol?

A. Not specifically.
I can add a retrospective note again, years later, that he had palpable ankle pulses, and again, in retrospect, maybe his symptoms were more than one would expect for a patient with palpable pulses at the ankle, but that did not lead to a specific diagnosis.
Q. The pulses, the palpable pulses at the ankle, were those the same as a person who had no peripheral vascular disease or were they less than you would --
A. They were less than normal.
Q. Okay. During the time that you have treated with Mr. Elich, did you recommend any tests to him to determine whether any symptoms he was experiencing were related to Baycol?
A. No.
Q. And I apologize if I asked this just a minute ago. Have you ever diagnosed Mr. Elich with any symptoms related to Baycol?
A. No.
Q. Is Pletal the only medication you prescribed for Mr. Elich?
A. Yes.
Q. Did you perform the hernia surgery on Mr. Elich?
A. No.

Q. Doctor, in your July 11, 2001 letter to Dr. Levine, you have a note in here that patient has been aware of bilateral calf claudication at about 100 to 150 feet. This claudication, that refers to leg pain; is that right?

A. Correct.

Q. And am I understanding this correctly; that the patient would experience leg pain after walking about 100 to 150 feet?

A. Correct.

Q. And is that leg pain consistent with peripheral vascular disease, a symptom of peripheral vascular disease?

A. Correct.

MS. DEGEN: I may be finished.

Do you have any questions?

MR. FOLDENAUER: Sure. I'll follow up on a couple things.

EXAMINATION

BY MR. FOLDENAUER:

Q. Good afternoon, Doctor. My name is Sean Foldenauer. I'm a lawyer and I represent your patient, Joseph Elich, in a class action lawsuit that pertains to the advertising and marketing of a statin

group drug called Baycol.

We've never spoken before today; was that your testimony?

A. Correct.

Q. All right. I haven't discussed with you at any time designating you as an expert witness to discuss statins, have I?

A. No.

Q. And you didn't prepare for your deposition today with an eye towards providing opinion testimony with regard to statin drugs, right?

A. I did not prepare for that.

Q. I think your testimony was that you had a general understanding of statins from your training and experience but it's not something that you prescribe regularly in your practice?

A. That's correct.

Q. You would defer to another medical provider to provide a prescription to your patients if you noted that they had elevated lipids or high cholesterol?

A. Correct.

MS. DEGEN: Object as to form.

Q. BY MR. FOLDENAUER: And you understood the question I just asked?

A. I rarely -- I don't initiate treatment, medical treatment of hypercholesterol anemia. I sometimes will renew a prescription for somebody or treat them with a medication they're already getting when they are in the hospital under my care, but I don't primarily treat hyperlipidemia.

Q. Would cholesterol levels be something you would even test for in your normal practice?

A. Occasionally. If a patient comes to me with peripheral vascular disease or atherosclerotic symptoms and have not already -- or are not already under the care of a primary care physician, I may do that as part of my initial screening, but that would be followed up by an internist or cardiologist for further care.

Q. And you wouldn't make a choice for your patients as to what type of statin would be appropriate to treat their high cholesterol?

MS. DEGEN: Object as to form.

THE WITNESS: I don't make recommendations as to specific statin drugs, no.

Q. BY MR. FOLDENAUER: Have you done any independent research with respect to the efficacy of Baycol?

A. No.

Q. Same question, Lipitor?
A. No.
Q. Zocor?
A. No.
Q. Welchol?
A. No.
Q. So you don't have any independent knowledge based upon studies or research that you've done comparing those different -- well, they're not all statins, but those cholesterol-lowering medications?
MS. DEGEN: Object as to form.
THE WITNESS: I can honestly say I don't know in detail the relative values of those different medications.
Q. BY MR. FOLDENAUER: Are you aware that in or about August 8th of 2001 that the manufacturer of Baycol voluntarily recalled its product from the market?
MS. DEGEN: Object as to form.
THE WITNESS: I remember the recall occurring. I don't remember the date.
Q. BY MR. FOLDENAUER: Okay. Do you have a data system or manner, as a medical doctor, for finding out about products that are about to be recalled before they're actually recalled?

MS. DEGEN: Object as to form.
THE WITNESS: I don't have any system like that.
Q. BY MR. FOLDENAUER: So let's just say, assuming the case of July 11th, 2001, when you met with Mr. Elich, you had no way of knowing that Baycol was going to be removed from the market on August 8th of 2001?
MS. DEGEN: Object as to form.
THE WITNESS: To the best of my knowledge, I didn't know that at that time.
Q. BY MR. FOLDENAUER: Do you think that you heard about the recall of Baycol at or around the time that it was actually recalled?
MS. DEGEN: Object as to form.
THE WITNESS: I don't have any specific recollection. I assume I got something in the mail that would have announced the recall.
Q. BY MR. FOLDENAUER: Okay. And is that the system; that you get something in the mail when there's a drug that's been recalled?
A. Yes, we get recall notices or change of indication notices or change of warning notices in the mail.
Q. And would it be custom and practice at around

that time, back in August of 2001, to read that notice around the time that you received it?

A. Yes.

Q. You testified, I believe, that on August 14th, 2001, you noted improved symptoms of Mr. Elich; is that correct?

A. Correct.

Q. Did you note, also, in your records that Mr. Elich had discontinued his taking of Baycol approximately a week before August 14th, 2001?

A. It's not indicated in the chart.

Q. Okay. At or around July 11th, 2001, was it your -- I want to have a clear record here. I'll strike that.

When you met with Mr. Elich on July 11th, 2001, were you attempting at that time to rule out all possible causes of the leg pain that he had complained of?

MS. DEGEN: Object as to form. Calls for speculation.

THE WITNESS: Again, I don't have any specific recollection of that particular evaluation, but the standard would be to consider neurologic and myopathic causes of pain in the differential. I will make the assumption that that occurred to me but that

I -- that there was both physical examination and radiographic evidence of atherosclerosis so that that was my primary thrust in treating him.

Q. BY MR. FOLDENAUER: Fair enough.

At least on your progress note you did note the prescription Baycol being taken by the patient?

A. Correct.

Q. And you thought that was significant? Is that why you wrote it into your progress note?

MS. DEGEN: Object as to form.

THE WITNESS: My standard would be to list the medications the patient's on the first time I see them.

Q. BY MR. FOLDENAUER: Did you request any follow-up studies, for instance, blood tests, to determine whether or not there was musculature toxicity due to the statin Mr. Elich had reported to you he was taking?

MS. DEGEN: Object as to form.

THE WITNESS: No.

Q. BY MR. FOLDENAUER: Okay. You're familiar with the term "rhabdomyolysis"?

A. Yes.

Q. And you've heard it used in connection with the prescription drug Baycol?

MS. DEGEN: Object as to form.
THE WITNESS: Yes.
Q. BY MR. FOLDENAUER: As of July 11th, 2001, did you specifically rule out a muscular injury due to ingestion of Baycol?
MS. DEGEN: Object as to form.
THE WITNESS: No.
Q. BY MR. FOLDENAUER: Did you rule out myalgia due to ingestion of Baycol?
MS. DEGEN: Object as to form.
THE WITNESS: No.
Q. BY MR. FOLDENAUER: Same question, myopathy?
MS. DEGEN: Object as to form.
THE WITNESS: No.
Q. BY MR. FOLDENAUER: You did indicate that the leg pulse at the ankle was slightly less than normal, is that right, as of August 14, 2001?
A. I use a scoring system of zero, one, two, three, four; where three is normal, four is more than normal, zero is not palpable at all, and one and two are less than normal.
Q. And what was your finding on August 14th of 2001?
A. That on the right side he had one plus pulses at two positions, and on the left side he had one plus

pulse at one position, which implies it was zero at the other position.

Q. And zero is a perfect blood flow, would you say?

A. No, zero is none. Three is normal and four is more than you'd expect.

Q. Okay. But it's your opinion as you sit here today that him presenting with a one or a plus one, as you've indicated, would not likely cause the muscle pain that he had reported to you?

MS. DEGEN: Object as to form. Misstates the witness's testimony.

THE WITNESS: The question is a little confusing. Can I -- let me -- at the time I saw him in our first meeting, there was objective evidence that he has some narrowing of the superficial femoral arteries in both legs. That would explain the diminished pulses. The arteries were not completely occluded, which would explain why he had pulses that were palpable at all.

Patients who have claudication, that is, calf muscle pain with use, usually don't have palpable pulses. But I think I can say that, in my experience, I have seen patients that do have pulses that were not normal but that were palpable and had ischemic

claudication. It's the exception but it's not unknown.

Does that answer your question?

Q. BY MR. FOLDENAUER: It does.

Well, when you find the type of leg pain that Joseph Elich was reporting to you in July and August of 2001, are you saying that you usually would not have found palpable pulses?

MS. DEGEN: Object as to form.

THE WITNESS: I think that's a correct interpretation. I think that in most patients who present with 100-foot claudication, they do not have palpable pulses, but there are exceptions.

Q. BY MR. FOLDENAUER: Would the lack of finding the -- or the finding of the palpable pulses potentially indicate another cause for the leg pain other than the peripheral vascular disease?

MS. DEGEN: Object as to form.

THE WITNESS: Other causes always need to be considered. I think that when I saw him initially, the whole presentation led me to believe it was probably ischemic, but that doesn't mean it couldn't have been something else.

Q. BY MR. FOLDENAUER: In hindsight, as you sit here today, and knowing that -- and I'll represent to

you a fact that on August 8th of 2001, Baycol was recalled from the market; and in reviewing your records and noting that the patient reported less leg pain at your August 14th visit, is one possible cause, in your opinion, that he had terminated his use of Baycol on August 8th, 2001?

MS. DEGEN: Object to form. Calls for speculation.

THE WITNESS: Based on my note of August 14th, 2001, I don't believe I knew that he had stopped the Baycol. That answers one part of the question, I think. The other part of the question is, could there be other reasons for improvement of his symptoms other than the Pletal medication that he had started a month previously? And the answer is yes, there could be other reasons; and, in fact, some people improve without any medication.

And there's a known practice called a walking program or an exercise program that can improve people's symptoms, and as part of our initial discussion, I probably talked to him about that. But I did not know that he had changed his lipid-lowering medication or stopped his lipid-lowering medication, so I don't think I considered that.

Q. BY MR. FOLDENAUER: Fair enough.

Since the time that you were treating Mr. Elich in 2001 and up until the time of your deposition today, have you done any independent research about the alleged reactions to taking of Baycol?

MS. DEGEN: Object as to form.

THE WITNESS: No, I have not done any independent research.

Q. BY MR. FOLDENAUER: In your practice from 2001 to the present, have you ever had a patient report to you complaints of pain which they believed was secondary to ingestion of Baycol?

A. Yes.

Q. Give me a moment.

Have you heard that it's been reported by the Associated Press as of August 14th, 2001, which I think is the very day that your second follow-up visit was with Mr. Elich, that 52 deaths had been linked to the drug Baycol?

MS. DEGEN: Object as to form.

THE WITNESS: I don't remember those numbers.

Q. BY MR. FOLDENAUER: Had you heard that, as of August 14th, 2001, it was published in the Associated Press or through the Associated Press that Baycol had

been associated with rhabdomyolysis?

MS. DEGEN: Object as to form.

THE WITNESS: I had heard that rhabdomyolysis is a known complication of statin drug therapy.

Q. BY MR. FOLDENAUER: Do you understand, as you sit here today, rhabdomyolysis having a different -- strike that.

You say statin drug therapy, in general. Do you specifically have knowledge, as you sit here today, whether the incidence rate of rhabdomyolysis connected to Baycol is higher than any other statin?

MS. DEGEN: Object as to form.

THE WITNESS: I think I infer that from one medication being removed from the market and others not, but I don't have any specific knowledge.

Q. BY MR. FOLDENAUER: You talked a little bit about your relationship with Dr. Levine. I think you were asked whether he was somehow associated with you and your practice, and your answer was no; is that right?

A. Correct.

Q. What does Dr. Levine specialize in, if anything, if you know?

A. I believe he's a specialist in internal

medicine.

Q. Internal medicine. And has he, over the years, referred you more patients than just Mr. Elich?

A. Yes.

Q. And you also refer patients to Dr. Levine?

A. Not very often. As a subspecialist, most of the patients that come to me already have primary care physicians.

Q. Okay. With respect to Mr. Elich's cholesterol levels, would you defer to Dr. Levine?

A. Yes.

Q. With respect to a planned treatment for Mr. Elich's cholesterol, would you defer to Dr. Levine?

A. Yes.

Q. Do you know Dr. Levine more than just a name on a sheet that comes to you with a referral? In other words, have you met with him before?

A. Yes.

Q. Socially, have you had dinner with him?

MS. DEGEN: Object as to form.

THE WITNESS: I see him at the hospital making rounds, but I don't have a social relationship with him, no.

Q. BY MR. FOLDENAUER: Do you respect him?

A. Yes.

Q. Have you discussed with Dr. Levine that he undertook to review your patient Mr. Elich's medical records, lab test results, medical charts, medical history, and made some findings specifically with respect to Mr. Elich's ingestion of Baycol?

MS. DEGEN: Object as to form.

THE WITNESS: The question is, did I know that he had done it?

MR. FOLDENAUER: Yes.

THE WITNESS: No, I did not know he had done that.

Q. BY MR. FOLDENAUER: So you're unaware of any opinions that Dr. Levine may have with respect to Mr. Elich's consumption of Baycol?

A. Correct.

Q. All right. And he didn't tell you that he had actually also been paid as a medical doctor, an internal medicine specialist, to do that research and to find those opinions on behalf of Mr. Elich?

MS. DEGEN: Object as to form.

THE WITNESS: I did not know that.

Q. BY MR. FOLDENAUER: Okay. But, again, in that regard, as Dr. Levine is Mr. Elich's doctor, you would defer to him?

MS. DEGEN: Object as to form.
THE WITNESS: Yes.
MR. FOLDENAUER: I have no further questions.
MS. DEGEN: I have just a couple follow-up questions, Dr. Deemer.
THE WITNESS: All right.

FURTHER EXAMINATION

BY MS. DEGEN:

Q. You mentioned earlier that when Mr. Elich presented to you, there was objective evidence of narrowing of superficial femoral arteries in both legs. What is that objective evidence that you're referring to?

A. I'm not sure which number it is there, the one we talked about before. It's the color duplex doppler ultrasound bilateral extremity.

Q. Is this the June 20th, 2001 study?

A. Correct.

Q. And I'm referring to what's been marked as Exhibit 3, pages ARD000006 and 7jre. Is this the study you're referring to?

A. Correct.

Q. What is it about this study that, in your

view, makes it objective evidence of narrowing of the arteries?

A. This is a study very similar to the one I described before for the carotid arteries. It involved both ultrasound, direct visualization of the arteries of the lower extremities from the groin to ankle, as well as measurement of velocity of the blood flow through those arteries.

The findings on the right side was that there was an area of narrowing in the femoral artery. A word of explanation. They give a number here, 450. That velocity is quite a bit higher than normal and indicates a more than 75 percent stenosis. The radiologist called it 75 to 90 percent. It's probably closer to 90 percent, but...

Q. When you say 75 to 90 percent stenosis, that means 75 to 90 percent of that artery is blocked?

A. Correct. The patent area is 10 to 25 percent of the previous luminous side.

On the right side the ankle/brachial index is .72, and again, an easy way to think of that is it's about 70 percent of normal profusion to the foot.

The left side, although the ankle/brachial index is almost the same, again .74, the narrowing in the femoral artery is not as severe as on the right

side. That would seem to be inconsistent, but in the text they mention a problem further up in the groin. So I think that on the left side there were two narrowings and the sum of that resulted in the lower ankle/brachial index, and on the right side there was one more severe spot.

Q. These color duplex doppler ultrasound studies, are these studies that you rely on in your practice in diagnosing patients with peripheral vascular disease?

A. Yes.

Q. And are these studies commonly relied on by physicians in your field in diagnosing peripheral vascular disease?

MR. FOLDENAUER: Objection. Calls for speculation as to other physicians in his field.

THE WITNESS: Yes.

Q. BY MS. DEGEN: Okay. Dr. Deemer, you also noted that when a patient presents with claudication, usually the patient would not have an ankle pulse, but in some instances patients do have an ankle pulse?

A. Correct.

Q. So then is it fair to say that the presence of an ankle pulse does not rule out peripheral vascular disease?

A. In general or in this specific case?
Q. First, in general, and then in this specific case.
A. In general, it does not rule it out. In this specific case, the pulse was diminished and actually consistent with the information we knew, that it was about 70 percent of normal.
Q. Okay. You also noted that some patients with claudication can improve even without taking medication; is that correct?
A. Correct.
Q. And you mentioned that exercise can improve the patient's symptoms; is that correct?
A. It cannot improve them back to normal, but it can improve them better than what they were.
Q. When you meet with a patient who has been diagnosed with peripheral vascular disease, is it your practice to discuss exercise options with them?
A. Yes.
Q. Is that something that in your normal practice you would have discussed with Mr. Elich when he came in?
A. Probably.
MS. DEGEN: Okay. I don't have any further questions.

Mr. Foldenauer?

MR. FOLDENAUER: Thank you.

FURTHER EXAMINATION

BY MR. FOLDENAUER:

Q. You don't have an opinion one way or another as to a comparison of the benefits versus the risks of statin drugs?

MS. DEGEN: Object as to form.

THE WITNESS: No.

Take that back. You're talking about overall as a class?

MR. FOLDENAUER: Yes.

THE WITNESS: I think overall as a class the benefits outweigh the risks as far as -- I think that is my understanding of the consensus opinion.

Q. BY MR. FOLDENAUER: Okay. And same question but specifically related to Baycol?

MS. DEGEN: Object as to form.

THE WITNESS: Again, I think that's a moot point. It's off the market.

Q. BY MR. FOLDENAUER: Do you have familiarity with how the FDA goes about requesting that a manufacturer voluntarily recalls its prescription drugs?

A. I don't know the specifics of that.

Q. Do you recall receiving literature from the manufacturer of Baycol in or around 1997 advising you of an inordinate amount of patient complaints with regard to muscle pain?

MS. DEGEN: Object as to form.

THE WITNESS: I don't remember that.

Q. BY MR. FOLDENAUER: Do you recall, when Baycol was released in 1997, receiving any literature from its manufacturer at all?

MS. DEGEN: Object as to form.

THE WITNESS: I don't recall.

Q. BY MR. FOLDENAUER: During your meetings with Mr. Elich, did you ever discuss with him the risks versus the benefits of taking statins?

MS. DEGEN: Object as to form.

THE WITNESS: Probably not specifically.

Q. BY MR. FOLDENAUER: Because that's outside your area; correct?

MS. DEGEN: Object as to form.

THE WITNESS: Yes.

Q. BY MR. FOLDENAUER: And you would have deferred to Dr. Levine?

A. I would have.

I usually limit my discussions with patients

to the risk of hyperlipidemia or hypercholesterol anemia and not the specific treatment of those problems.

Q. What are CPK tests?

A. Creatine phosphokinase is an enzyme that is measurable in the plasma and is frequently used to evaluate for muscle injury.

Q. With regard to Mr. Elich, you didn't request that test; correct?

A. No, I did not.

Q. And in looking at your file today, you have no documentation of the results of any tests?

A. Correct.

Q. A CPK test he may have taken?

A. I don't have that, no. It's not in the chart.

Q. So that type of evidence is not something that you considered in making your findings with respect to Mr. Elich?

MS. DEGEN: Object as to form.

THE WITNESS: Correct, it would not be a usual test to order with the presentation that he initially had.

Q. BY MR. FOLDENAUER: The 72 and 74 percent that you discussed, which is set forth in the

Radiology Medical Group results -- I don't know the date, but it --
A. June 20th, 2001.
Q. June 20th, 2001, okay.
Have you had in your practice and experience many patients with those reported levels?
A. Yes.
Q. It's pretty common?
A. Yes.
Q. And, in fact, you've had --
MS. DEGEN: Object as to form as to the previous question.
Q. BY MR. FOLDENAUER: You've had patients with those levels who didn't have leg pain, right?
MS. DEGEN: Object as to form.
THE WITNESS: If, for example, a person is fairly sedentary and only walks around room to room in the house, they can have very ischemic legs and not have much in the way of symptoms. More severe than in this case.
Q. BY MR. FOLDENAUER: Well, is it your belief that the level of ischemia, is that an accurate -- pointing to the numbers 72 and 74, is that an accurate indicator of ischemia?
MS. DEGEN: Object as to form.

THE WITNESS: That number is a ratio that describes what percentages of the person's central blood pressure is arriving at the ankle. It's not a specific indicator of how much blood flow is getting to the tissue, although for most people under usual conditions can correspond to that.

Q. BY MR. FOLDENAUER: As you sit here today, do you know whether Mr. Elich's numbers are different than those set forth on June 20th of 2001?

MS. DEGEN: Object as to form.

THE WITNESS: I don't know what they are currently.

Q. BY MR. FOLDENAUER: It could be a lot higher; it could be a lot lower, you just don't know?

A. Unlikely to be much better. The atherosclerotic process can level off and you can get some improvement with what they call collateral blood flow, but it's not usually a significant improvement, and it certainly could be a lot worse. Progression of the disease would be the norm.

Q. So, in your opinion, you believe it is most likely that these numbers would be the same or worse in Mr. Elich's case?

MS. DEGEN: Object to form.

THE WITNESS: Probably.

Q. BY MR. FOLDENAUER: Now, assuming that to be a fact in this hypothetical, that the numbers are the same or worse, meaning they're higher than these numbers --

A. Lower. Lower is worse.

Q. Okay. The same or lower than these numbers, and assuming that Mr. Elich also reported to you less pain in his legs, would that indicate to you that there was potentially an alternative cause for the initial leg pain?

MS. DEGEN: Object as to form.

THE WITNESS: That would be one of the possibilities. There are individuals who seem to accommodate their disease and can have the same degree of arterial narrowing with somewhat milder symptoms.

But you're right, when someone has significant disease and they improve spontaneously, other things have to be considered.

MR. FOLDENAUER: I have no further questions.

FURTHER EXAMINATION

BY MS. DEGEN:

Q. Doctor, just one question to clarify.

Mr. Foldenauer asked whether an

ankle/brachial index of .72 or .74, whether that is common, and I believe you said yes. Were you referring to common within the group of patients that you see?

A. Correct.

Q. Would that index be common in the population as a whole?

MR. FOLDENAUER: Calls for speculation. It's an epidemiological question. Outside the scope of this witness's testimony.

MS. DEGEN: I'm questioning.

THE WITNESS: It's an epidemiologic question. In younger people, say less than 65, it would be unusual. In large group screening tests that are done across the country in a variety of different situations, in individuals older than 65, it would represent probably 10 to 20 percent of the screening population in that age group.

Q. BY MS. DEGEN: The patients that you generally see are patients who have some sort of vascular disease; is that fair to say?

A. They've been pre-selected. They've already been determined by their primary care physician, either based on symptoms or based on some kind of testing, to have that problem already.

Q. Okay. So the patient group that you see are patients who are more likely to be in that 10 to 20 percent for older patients?

A. Correct.

MR. FOLDENAUER: Object as to form.

MS. DEGEN: I understand.

I don't have any further questions.

MR. FOLDENAUER: Great.

MS. DEGEN: Dr. Deemer, thank you very much for your time today.

THE WITNESS: You're welcome.

MS. DEGEN: Off the record.

(Discussion held off the record.)

MS. DEGEN: Let's go back on the record.

Dr. Deemer, while we were off the record, we were discussing whether you would like the opportunity to review and sign your deposition transcript. And it's my understanding that you are waiving the right to review the transcript; is that correct?

THE WITNESS: That's correct.

MS. DEGEN: Okay. Then I think once the court reporter prepares a true and correct transcript and forwards the original to counsel for Bayer Corporation, she's relieved of her duties.

Defendant Bayer Corporation will retain the



9063d3c9-042b-4639-a9a2-f3d8234ea4d8

original transcript. If the original transcript is lost for any reason, a certified copy can be used in any further proceedings.

Is there anything you would like to add?

MR. FOLDENAUER: Just I'll take a certified copy.

And to the extent that there's actually been a waiver here -- as a footnote, I don't know that that's the case. He hasn't actually seen the transcript. The law in respect to waiver is a knowing waiver of something, which if there's a mistake in there or not, he wouldn't know it. So I don't know that that's a clear statement.

Other than that, send me a certified copy, and we're done.

MS. DEGEN: So we are able to use the transcript, then, Doctor, could we forward it to you for your review?

THE WITNESS: Okay.

MS. DEGEN: All right. Then we will forward the transcript to Dr. Deemer for his review.

Do you think you'll be able to get it turned around in about 45 days after having seen it?

THE WITNESS: Oh, yes.

MS. DEGEN: Then we will ask that the witness

have -- off the record for one second.

(Discussion held off the record.)

MS. DEGEN: It is stipulated between counsel that Dr. Deemer has the right to read and sign the deposition transcript within 45 days after the transcript has been made available to him. This time period shall not be extended unless good cause is shown.

Should the deponent fail to return the transcript within 45 days, all parties have the right to use a copy of the transcript in any further proceedings as though the copy were the original transcript. Should the deponent fail to return the errata sheet within that time, the transcript will be deemed to have been read and approved by the deponent. And the rest of our agreement is already on the record.

MR. FOLDENAUER: Agreed. Thank you.

(The deposition of Andrew R. Deemer, M.D., was concluded at 3:40 p.m.)

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN DIEGO )

DECLARATION UNDER PENALTY OF PERJURY

I, ANDREW R. DEEMER, M.D., declare, under penalty of perjury under the laws of the State of California, that I have read the foregoing deposition transcript in its entirety and that the testimony contained herein, as corrected by me, is a true and correct transcription of the testimony elicited at the time and place set forth herein.

Executed this _____ day of _____________, 2006, at _____________________, _________________________.
(City) (State)

_____________________________
ANDREW R. DEEMER, M.D.

# Exhibit D

**IN THE CIRCUIT COURT**
**TWENTIETH JUDICIAL CIRCUIT**
**ST. CLAIR COUNTY, ILLINOIS**

| | | |
|---|---|---|
| TERESA DE BOUSE, Individually and On Behalf of Others Similarly Situated,<br><br>Plaintiffs, | ) | |
| v. | ) | Case No. 04-L-53 |
| BAYER A.G., BAYER CORPORATION, SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE, GLAXOSMITHKLINE PLC, MARCY GRIM, MICHAEL HARVEY DAVIDSON, M.D., and MICHAEL LEVER,<br><br>Defendants. | ) | |

**DEFENDANT BAYER CORPORATION'S OBJECTIONS AND RESPONSES TO PLAINTIFF TERESA DE BOUSE'S REQUESTS TO ADMIT FACTS**

COMES NOW Defendant Bayer Corporation (hereafter "Bayer"), and for its Objections and Responses to Plaintiff Teresa De Bouse's Requests to Admit Facts, states as follows:

1. The putative class members in the instant action are geographically dispersed throughout numerous counties within Illinois.

**ANSWER:** Objection. This Request seeks information that is more readily available to Plaintiff. As Plaintiff has refused to disclose to Bayer relevant information about the putative class members and as Bayer does not know the identity of all Illinois Baycol purchasers, Bayer is without knowledge or information sufficient to form a belief as to this Request and, therefore, denies the same.

2. Illinois purchasers of Baycol are geographically dispersed throughout numerous counties in Illinois.

**ANSWER:** Objection. This Request seeks information that is more readily available to Plaintiff. As Plaintiff has refused to disclose to Bayer relevant information about the putative class members and as Bayer does not know the identity of all Illinois Baycol

purchasers, Bayer is without knowledge or information sufficient to form a belief as to this Request and, therefore, denies the same.

3. You are aware of the number of Illinois purchasers of Baycol.

**ANSWER:** Objection. This request is vague and ambiguous. Without waiving said Objection, Bayer denies this request as stated. Bayer admits it has data in its possession regarding Baycol prescriptions written in its sales territories. Bayer denies that it is able to identify each purchaser or the number of individual purchasers of Baycol in Illinois.

4. You have possession, custody, or control of the names of each individual that purchased Baycol in Illinois.

**ANSWER:** Denied.

5. You have possession, custody, or control of information, data, or documentation concerning individuals that purchased Baycol in Illinois.

**ANSWER:** Objection. This request is vague and ambiguous. Without waiving said Objection, Bayer denies this request as stated. Bayer admits it has data in its possession regarding the number of Baycol prescriptions written in its sales territories. Bayer denies that it is able to identify each purchaser of Baycol in Illinois.

6. More than 5,000 separate individuals purchased Baycol in Illinois.

**ANSWER:** Objection. This Request seeks information that is more readily available to Plaintiff. As Plaintiff has refused to disclose to Bayer relevant information about the putative class members and as Bayer does not know the identity of Illinois Baycol purchasers, Bayer is without knowledge or information sufficient to form a belief as to this Request and, therefore, denies the same.

7. You have had contact with entities selling Baycol in Illinois.

**ANSWER:** Objection. This Request is vague, ambiguous and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence.

8. After Baycol was withdrawn from the market, you sent letters to Illinois purchasers of Baycol offering to reimburse them for unused portions of the drug.

**ANSWER:** Objection. This request is vague and ambiguous. Without waiving and subject to said Objection, Bayer admits that after Baycol was withdrawn from the market it sent letters to certain purchasers of Baycol offering to reimburse them for unused portions of the drug. Bayer denies that it sent such letters to all purchasers of Baycol in Illinois.

9. You have access to information concerning the identity of all individuals that purchased Baycol in Illinois.

**ANSWER:** Objection. This Request is vague and ambiguous as to the term "access." Without waiving and subject to said Objection, Bayer denies the Request.

10. The Illinois Consumer Fraud Act has been alleged to apply to the claims of all putative class members in the instant action.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, this Request is vague, confusing and ambiguous. Furthermore, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

11. All putative class members in the instant action are alleged to have been aggrieved by the same or similar conduct.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

12. The omissions, suppressions, and/or concealments alleged in the instant action are further alleged to have similarly affected all of the putative class members.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

13. Each putative class member is alleged to have purchased Baycol.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

14. Each putative class member is alleged to have resided in Illinois.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

15. The instant action does not allege personal injury.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

16. The instant action does not alleged emotional or physical injury.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

17. Manufacturers of pharmaceutical products have a special relationship with the purchasers of their products that requires full disclosure of any safety concerns associated with their products.

**ANSWER:** Objection. This Request is vague and ambiguous as to the phrase "special relationships." Further, said Request calls for a legal conclusion, speculation and conjecture.

18. The instant action alleges that the defendants omitted, suppressed, and/or concealed safety and efficacy information from all putative class members.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rule of Civil Procedure 216(a) in that it does not relate to a matter of fact, but relates to a conclusion of law. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

19. Some of the issues to be decided in the instant action have been decided in prior suits where you were a defendant.

**ANSWER:** Objection. This Request is vague and ambiguous. Additionally, said Request calls for a legal conclusion, speculation and conjecture as to what issues pertain to this case and what issues have been "decided" in prior suits.

20. You intended all direct and indirect communication made by you to users of Baycol to be relied upon by the users and purchasers of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Subject to, and without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising. Bayer admits that its prescribing information, sales aids, and marketing documents communicated adequate information to healthcare professionals regarding the safety and efficacy of Baycol upon which they could rely in prescribing the drug.

21. You initiated, disseminated, or sponsored, contact, correspondence, or communication about Baycol in Illinois.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising, but otherwise admits that its sales representatives had contacts and communications with healthcare professionals and distributed marketing materials in Illinois.

22. You communicated information about the safety and efficacy of Baycol to Illinois purchasers of Baycol with the intent that they rely upon the information communicated.

**ANSWER:** Objection. This Request is vague and ambiguous. Subject to, and without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising. Bayer admits that its prescribing information, sales aids, and marketing documents communicated adequate information to healthcare professionals regarding the safety and efficacy of Baycol, including adverse events, contraindications, warnings and admonitions concerning its use, upon which they could rely in prescribing the drug.

23. You communicated all safety and efficacy information about Baycol to Illinois purchasers of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Subject to, and without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising. Bayer admits that its prescribing information, sales aids, and marketing documents communicated adequate information to healthcare professionals regarding the safety and efficacy of Baycol, including adverse events, contraindications, warnings and admonitions concerning its use, upon which they could rely in prescribing the drug.

24. You did not disclose all of the information that concerned the safety of Baycol to Illinois purchasers of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Subject to, and without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising. Bayer further denies that its prescribing information, sales aids, and marketing documents failed to communicate adequate information to healthcare professionals regarding the safety and efficacy of Baycol, including adverse events, contraindications, warnings and admonitions concerning its use, upon which they could rely in prescribing the drug.

25. You did not disclose all of the information that concerned the efficacy of Baycol to Illinois purchasers of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Subject to, and without waiving said Objection, Bayer denies that it engaged in direct-to-consumer advertising. Bayer further denies that its prescribing information, sales aids, and marketing documents failed to communicate adequate information to healthcare professionals regarding the safety and efficacy of Baycol, including adverse events, contraindications, warnings and admonitions concerning its use, upon which they could rely in prescribing the drug.

26. Baycol was withdrawn from the United States Market due to safety concerns that were known by you before the actual withdrawal.

**ANSWER:** Bayer admits Baycol was withdrawn for the reasons set forth in its "Dear Healthcare Professional" letter of August 8, 2001, but denies the remainder of this Request.

27. You advertised Baycol directly to prospective consumers of Baycol.

**ANSWER:** Denied.

28. Bayer Corporation and Bayer Corporation, themselves, or by the use of its agents, and/or apparent agents, manufactured, created, designed, tested, labeled, sterilized, packaged, distributed, supplied, marketed, promoted, sold, advertised, warned, and/or distributed in the course of trade or commerce, the product known as Baycol (sic).

**ANSWER:** Objection. This Request is vague, confusing and ambiguous. Subject to and without waiving said Objection, Bayer admits that it obtained FDA approval for and tested, packaged, marketed, promoted, sold and distributed Baycol in the United States. Except as specifically admitted herein, Bayer denies the remainder of the Request.

29. You are in possession, custody, or control of information, data, documentations, analyses, or reports concerning the current fair market value of Baycol.

**ANSWER:** Objection. This Request is vague, confusing and ambiguous. Subject to and without waiving said Objection, Baycol admits that it has information related to the value of Baycol.

30. The fair market value of Baycol after being withdrawn in the United States market is/was less than the fair market value of Baycol before it was withdrawn from the United States market.

**ANSWER:** Objection. This Request is vague and ambiguous, seeks conclusions that will be the subject of expert opinion, not matters of fact and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence; therefore, it is improper as beyond the scope of Illinois Rule of Civil Procedure 216.

31. You transacted business in the State of Illinois.

**ANSWER:** Objection. This Request seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Further, said Request is vague, ambiguous and calls for speculation and a legal conclusion.

32. You owned, possessed, or used real estate situated in the State of Illinois in your effort to manufactured, created, designed, tested, labeled, sterilized, packaged, distributed, supplied, marketed, promoted, sold, advertised, warned, and/or distributed in the course of trade or commerce, the product known as Baycol (sic).

**ANSWER:** Objection. This Request seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Further, said Request is vague, ambiguous and calls for speculation and a legal conclusion.

33. The instant action alleges that putative class members have been aggravated by the same or similar conduct.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rules of Civil Procedure 216(a) in that Plaintiff is requesting Bayer to admit an allegation stated in the Complaint as opposed to relevant facts. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

34. The claims of the individual class members in the instant action are based upon common application of a statute.

**ANSWER:** Objection. This Request is vague, ambiguous, and calls for a legal conclusion. Additionally, this Request is improper in that it is beyond the scope of Illinois Rules of Civil Procedure 216(a) in that Plaintiff is requesting Bayer to admit an allegation stated in the Complaint as opposed to relevant facts. Furthermore, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

35. The instant case consists of a putative Illinois class that shares a common question of law.

**ANSWER:** Objection. This Request is vague, ambiguous, and calls for a legal conclusion. Additionally, this Request is improper in that it is beyond the scope of Illinois Rules of Civil Procedure 216(a) in that Plaintiff is requesting Bayer to admit an allegation stated in the Complaint as opposed to relevant facts. Furthermore, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

36. You made or performed contracts or promises that concerned Baycol and the transaction of business in Illinois.

**ANSWER:** Objection. This Request seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Further, said Request is vague, ambiguous and calls for speculation and a legal conclusion.

37. When the FDA approved Baycol, you knew that it was less effective at the approved dosages than other statin drugs already on the market.

**ANSWER:** Denied.

38. This case is predicated upon a series of essentially identical transactions.

**ANSWER:** Denied.

39. Teresa DeBouse is an adequate representative in the instant action.

**ANSWER:** Denied.

40. The named representative in the instant action has alleged the same damage by the same conduct and sought the same remedy as the putative class members.

**ANSWER:** Objection. This Request is improper in that it is beyond the scope of Illinois Rules of Civil Procedure 216(a) in that Plaintiff is requesting Bayer to admit an allegation stated in the Complaint as opposed to relevant facts. Additionally, the Complaint filed in this case is in writing and speaks for itself. Bayer's response to the allegations of the Complaint is, as required by the Rules, contained in its answer thereto.

41. The named representative has retained experienced counsel.

**ANSWER:** Bayer is without knowledge or information sufficient to form a belief as to this Request and, therefore, denies the same.

42. Given the high rate of adverse event reports associated with the use of Baycol, you knew that a significant percentage of the adverse effects patients had experienced were causally related to Baycol use because these same adverse experiences had occurred in earlier controlled studies.

**ANSWER:** Denied.

43. Studies, clinical data, investigations, and other sources of information known by you demonstrated the dangers Baycol posed to its users before you withdrew Baycol from the United States Market.

**ANSWER:** Objection. This Request is vague and ambiguous.

44. There is a medically conclusive link between Baycol and the side effects of rhabdomyolysis and/or myopathy.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

45. Prior to withdrawal from the United States market, you obtained statistical evidence, data, or information that rhabdomyolysis and/or myopathy may be caused, other than randomly, by use of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

46. Prior to withdrawal from the United States market, you viewed the adverse event reports of Baycol users as sufficiently serious and frequent to affect your future earnings.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

47. Prior to Baycol's withdrawal from the United States market, you had knowledge of, or facts from, or access to information that contradicted your public statements concerning the efficacy and/or safety of Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

48. Prior to Baycol's withdrawal from the United States market, some or all of your executives believed that there was a confluence of information about the adverse effects of Baycol was putting the Baycol brand at risk.

**ANSWER:** Objection. This Request is vague and ambiguous and seeks information relating to the internal thought processes of unnamed individuals, not matters of fact.

49. Prior to Baycol's withdrawal from the United States market, some of your management personnel communicated that they knew or believed that there existed data that was significant enough to threaten Baycol's market, earnings, and/or sales viability.

**ANSWER:** Objection. This Request is vague and ambiguous.

50. You had an accumulation of anomalous findings of Baycol's apparent safety concerns before withdrawing Baycol from the United States market.

**ANSWER:** Objection. This Request is vague and ambiguous.

51. As early as the summer of 1997, you or certain of your personnel, learned of adverse interactions between Baycol and several other drugs.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer admits that as set forth in the Baycol label interactions with other drugs was a risk to be evaluated by prescribing physicians.

52. In, or about, 1997, you received a letter from your marketing partner, SmithKline Beecham Corporation, that expressing and/or warning that simple and safe did not appear to be a viable promotional platform for Baycol.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

53. There is a causal relationship between Baycol and rhabdomyolysis.

**ANSWER:** Objection. This Request is vague and ambiguous. Without waiving said Objection, Bayer denies this Request.

54. You withheld information and/or data concerning Baycol from the Federal Drug Administration ("FDA").

**ANSWER:** Denied.

WILLIAMS VENKER & SANDERS LLC

By: [signature]

Terry Lueckenhoff
Heather Langlois, #6257969
10 South Broadway, Ste. 1600
St. Louis, Missouri 63102
(314) 345-5000
(314) 345-5055 (facsimile)

Attorneys for Defendants Bayer AG,
Bayer Corporation, Marcy Grim and Michael Lever

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was sent first-class U.S. Mail, postage prepaid, on this 5th day of January, 2005 to:

John J. Driscoll
Brown & Crouppen, P.C.
720 Olive Street
Suite 1800
St. Louis, MO 63101
ATTORNEYS FOR PLAINTIFF

Christopher Cueto
Law Office of Christopher Cueto, PC
7110 West Main Street
Belleville, IL 62223
ATTORNEYS FOR PLAINTIFF

John E. Galvin
Fox Galvin, LLC
One Memorial Drive
Eighth Floor
St. Louis, MO 63102
ATTORNEYS FOR DEFENDANT GLAXOSMITHKLINE

Heather Lawson