# Exhibit G

FILED
LOS ANGELES SUPERIOR COURT
JAN 1 5 2002
JOHN A. CLARKE, CLERK
BY S. J. WHITLOW, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| JOHN DELANEY, on behalf of himself individually, and of all others similarly situated, and on behalf of the general public; and MICHAEL E. O'KEEFE, on behalf of the general public,<br><br>Plaintiffs,<br>v.<br><br>WARNER-LAMBERT COMPANY, a Delaware corporation; PARKE-DAVIS & COMPANY, a Michigan corporation; and Does 1 through 100, inclusive,<br><br>Defendants. | Case No: BC227414<br><br>JUDICIAL COUNCIL COORDINATION PROCEEDING NO.: 4122<br><br>STATEMENT OF DECISION RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

## I.

## BACKGROUND

Beginning in 1997, defendants manufactured and marketed the drug Rezulin for treatment of Type II, or adult-onset, diabetes. The drug was ultimately taken off the market on March 20, 2000.

According to plaintiffs, defendant Warner-Lambert's advertising and marketing campaign

"uniformly concealed material and critical information" about Rezulin's risks and potential side effects. Plaintiffs claim that defendant "knew" that Rezulin would kill a certain percentage of people who took it, yet promoted the drug as "safe" and comparable to a "placebo." Plaintiffs claim that Rezulin was in fact highly toxic to 1 and 20 users, causing liver damage which, if unchecked, would leave to jaundice, liver failure, and/or death.

Plaintiffs assert that Warner-Lambert commenced its ad campaign for Rezulin at least six months before FDA approval. Warner-Lambert's CEO, Melvin Goode, allegedly predicted that Rezulin would be a "breakthrough" and "blockbuster" drug. Rezulin exceeded sales projections within the first few months of its release, and garnered a significant portion of the diabetic drug market. Plaintiffs claim that the primary reason for the success of the drug can be attributed to defendant's direct-to-consumer ad campaigns.

According to plaintiffs, the ad campaigns included "three basic deceptive themes: (1) effectiveness, (2) safety, and (3) credibility and trust."[1] Plaintiffs also claim that Warner Lambert created confidence among physicians by paying specialists to endorse the drug, and funding and sponsoring organizations of specialists which recommended the drug's use.

In late-1997, Rezulin's European licensee, Glaxo-Welcome, withdrew the drug from the market after reports of adverse side effects including fatalities. Plaintiffs assert that defendant's public relations and marketing executives adopted a four-prong defensive strategy in anticipation of the upcoming problems: 1) "falsely denying" there was anything in AE reports which was inconsistent with the "excellent safety profile" for Rezulin supposedly observed during pre-marketing clinical trials; 2) recommending to physicians that they monitor their patients using

---

[1] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 7.

Rezulin with blood tests for elevated ALT liver enzyme levels on a monthly basis; 3) instructing salesmen to stress the danger of *diabetes*, and to e-emphasize the adverse side effects of Rezulin through the so-called "Detail Sheets"; and 4) attacking the victim and not the drug.

However, plaintiffs claim that defendant "was unable to suppress the deadly truth about Rezulin indefinitely."[2] The FDA opened hearings on Rezulin which lasted for months and ultimately resulted in defendant pulling Rezulin from the market. Plaintiffs also claim that an August 3, 1998 Warner-Lambert email revealed 26 reported fatalities and 320 cases of serious liver toxicity due to Rezulin.

Plaintiffs claim that during the time Rezulin was on the market, 1.23 million people used the drug, with more than 200,000 users in California. Defendant reportedly made $2 billion in sales, and spent over $425 million in ads and promotions.

Plaintiffs John Delaney and Elliott Rosman seek certification of the class in BC227414. The proposed class is defined as "all persons or entities who purchased Rezulin in the State of California up to and including the date of this complaint."[3] Plaintiffs define the class period as between March 1, 1997 and March 20, 2000.[4]

## II.

## DISCUSSION

**Standards on Class Certification**

---

[2] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 10.

[3] Complaint, ¶13.

[4] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 1.

CCP § 382 allows the Court to certify a class action "when the question is one of a common interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court..." Additionally, "[t]here must be questions of law or fact common to the class that are substantially similar and predominate over the questions affecting the individual members; the claims of the representatives must be typical of the claims or defenses of the class; and the class representatives must be able to fairly and adequately protect the interests of the class." *Apple Computer, Inc., supra*, 91 Cal.App. 4th at 237-238.

Stated differently, there are two requirements for a class action: 1) an ascertainable class; and 2) a well-defined community of interest. *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal. App. 4th 980, 913 (2001).

In determining whether the class is ascertainable, courts consider the size of the class, the class definition, and the means to identify class members. *Reyes v. San Diego County Board of Supervisors*, 89 Cal. App. 3d 1263, 1274 (1987). The community of interest factor is established by showing: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 435 (2000).

Moreover, California follows the procedures set forth under Federal Rules of Civil Procedure 23 for class actions, whenever California authority is lacking. *City of San Jose v. Superior Court (Lands Unlimited)*, 12 Cal. 3d 447, 453 (1974).

The burden of proof on a motion for class certification is on the party seeking certification. *Washington Mutual Bank, N.A. v. Superior Court*, 24 Cal. 4th 906, 922. In this case, that burden falls on plaintiffs John Delaney and Elliot Rosman.

**1. Ascertainability/Numerosity**

"Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata." *Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 914. "If the existence of an ascertainable class has been shown, there is no need to identify its individual members in order to bind all members by the judgment." *Daar v. & Yellow Cab Company* (1967) 67 Cal.2d 695, 706.

In order to satisfy the numerosity requirement, the class must be so numerous that joinder is impractical. FRCivPro 23(a). Case law indicates that 30-40 plaintiffs satisfies the numerosity requirement, because at that point, individual joinder is impractical. *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934.

Defendants do not address the ascertainability/numerosity requirement in their opposition to plaintiffs' class certification motion. In any case, the Court finds that the ascertainability and numerosity factors are satisfied. The class is defined as "all persons or entities who purchased Rezulin in the State of California up to and including the date of this complaint."[5] At the class certification hearing, plaintiffs proposed revising this class definition to exclude those individuals who suffered personal injury as a result of taking Rezulin. Under either definition, the proposed class is ascertainable. Moreover, according to plaintiffs, the class consists of approximately 200,000 members. Joinder of these 200,000 class members would be impractical.

For these reasons, the Court finds that plaintiffs have met their burden under *Washington Mutual Bank, supra*, of showing the class is ascertainable and numerous.

---

[5] Complaint, ¶13.

**2. Community of Interest**

The Court finds that plaintiffs have not shown under California law that there is an adequate "community of interest" for class certification. The Court takes each of the CCP § 382 factors in turn.

**a. Common Questions of Law and Fact Do Not Predominate**

In deciding whether the common question "predominates," and whether a class action would be "superior" to individual lawsuits, courts usually consider:

> 1) The interest of each member in controlling his or her own case personally;
>
> 2) The difficulties, if any, that are likely to be encountered in managing a class action;
>
> 3) The nature and extent of any litigation by individual class members already in progress involving the same controversy; and
>
> 4) The desirability of consolidating all claims in a single action before a single court. Weil & Brown, *Civil Procedure Before Trial*, § 14:16 (citing FRCivPro 23(b)(3)).

Additionally, a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages. *Vasquez v. Superior Court*, 4 Cal.3d 800, 815-816 (1971). However, a class action "will not be permitted...where there are diverse factual issues to be resolved, even though there may be many common questions of law." *Brown v. Regents of Univ. of Calif.*, 151 Cal. App. 3d 982, 988-89 (1984).

Even though damages between class members may differ under this element, the Court finds that plaintiffs have not met their burden under *Washington Mutual* of showing that common questions of law and fact predominate. In paragraph 15 of the complaint, plaintiffs set forth the

following questions of law or fact which they claim predominate over any questions which may affect only individual members of the class:

a) whether Defendants engaged in unlawful business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

b) whether Defendants engaged in unfair business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

c) whether Defendants engaged in fraudulent business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

d) whether Defendants engaged in unfair, deceptive, untrue or misleading advertisements in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

e) whether Defendants violated provisions of California Business and Professions Code, Section 17500 *et seq.*;

f) whether Defendants made false and misleading claims in advertising to consumers, including but not limited to claims that (1) purport to be based on factual, objective, or clinical evidence, and/or that (2) compare Rezulin's effectiveness and/or safety to that of other brands of drugs used in the treatment of diabetes; and/or (3) purport to be based on fact that Rezulin is a safe and effective treatment of type 2 diabetes in violation of California Business and Professions Code, Section 17500 *et seq.;*

g) whether Defendants violated California Civil Code, Section 1770(a)(5) [CLRA] by misrepresenting the characteristics, benefits, or qualities of Rezulin;

h) whether Defendants violated California Civil Code, Section 1770(a)(7) by misrepresenting the quality of the goods provided by Defendants;

i) the effect of Defendants' conduct upon Plaintiff John Delaney, and the members of the Class; and

j) the appropriate measure of restitution of all ill gotten gains.

At first impression, the allegations in ¶15 would seem to indicate predominate questions of law and fact exist with regard to defendants' alleged violations of the UCL and the CLRA. However, the

analysis of the "predominate common question" element does not end with a cursory "glancing over" these allegations. If the proposed class was certified, the subsequent trial of the CLRA claim would necessarily require the Court to make a case-by-case inquiry on whether each putative class member sustained any damage as a result of the allegedly false advertising (i.e., the Court would be required to make a determination as to reliance and damage thereby as to each putative class member). In other words, while some class members and physicians may have been misled in violation of the CLRA, others may not have been. The *extent* to which individual plaintiffs were misled by the advertisements (and corresponding impact of those advertisements) necessitates a further individual case inquiry. The Court would also have to conduct an individualized analysis on the reliance of putative class members (and their physicians) on defendants' advertisements promoting Rezulin. The Court finds that such inquiries are inappropriate for a class action. Aside from paragraph 15's allegations, there is no evidence indicating that common questions of fact and law *predominate*.

As to the 17200 claim, reliance is not a factor (the issue being whether the advertisements were likely to deceive rather than if they actually deceived any consumer). However, this cause of action raises another problem requiring individualized analysis. In the complaint, plaintiffs allege two basic deceptive statements: that Rezulin was effective and that Rezulin was safe. While the "safety" issue can be addressed on a classwide basis, the "effectiveness" issue cannot. The evidence is that Rezulin was effective in controlling some patients' blood sugar and ineffective as to other patients. In order to determine this "effectiveness" issue, the trier of fact would be required to hold individual mini-trials. Was Rezulin effective for this particular class member? To what extent? Of the $5.00 per pill cost, was the drug worth $1.00 to this class member because of its effectiveness or $3.50? The variations are endless and extremely individualized. To deal with this problem,

plaintiffs at the class certification hearing indicated that they would waive the "effectiveness" argument, assume for purposes of this litigation that Rezulin was effective, and simply proceed on the "safety" argument. Such a waiver, however, would violate the class representatives' fiduciary duties to the class. For those class members for whom Rezulin was not effective, their damages could potentially include the cost of the drug for the entire time they took it (an amount that could be in excess of $5,000 per class member). Class plaintiffs may only recover once for the purchase of the drug; by seeking damages only on the "safety" theory, plaintiffs would effectively waive, on behalf of thousands of class members, any possible recovery of potential damages on the "effectiveness" theory. This plaintiffs may not do. *City of San Jose, supra at 464.* Again, common questions do not predominate.

The facts of the instant case are analogous to those in *City of San Jose*. Plaintiffs in *City of San Jose* sought recovery for diminution in the market value of their property allegedly caused by aircraft noise, vapor, dust, and vibration as a result of airplanes flying to and from the San Jose Municipal Airport. The trial court certified the class. The California Supreme Court reversed, and determined that the trial court abused its discretion in certifying the class. The Court concluded that the action for nuisance and inverse condemnation was "predicated on facts peculiar to each prospective plaintiff." *City of San Jose* at 461. The Court reasoned:

> An approaching or departing aircraft may or may not give rise to actionable nuisance or inverse condemnation depending on a myriad of individualized evidentiary factors. While landing or departure may be a fact common to all, liability can be established only after extensive examination of the circumstances surrounding each party. Development, use, topography, zoning, physical condition, and relative location are among the many important criteria to be considered. No one factor, not even noise level, will be determinative as to all parcels. *City of San Jose* at 461.

Like *City of San Jose*, the Court would only be able to determine liability in *Delaney* based "on a

myriad of individualized evidentiary factors." The allegedly false/misleading advertising in violation of the UCL and CLRA are facts common to all, but as discussed *supra*, the Court would have to examine the individual circumstances surrounding each purported violation.

In short, there *are* common legal and factual questions in this case. However, the key to the common legal/factual issues factor is whether those issues *predominate*. For these reasons, the legal and factual questions do not predominate. The Court finds the "commonality" factor is not satisfied.

**b. Typicality**

In order to satisfy the typicality requirement, "[class] representatives must have the same interests and have suffered the same injuries as members of the proposed class." *Zachary v. Texaco Exploration & Production, Inc.*, 185 F.R.D. 230, 240 (W.D. Tex. 1999). "The purported representative's claim must be 'typical,' but not necessarily identical to the claims of other members." Weil & Brown, *Civil Procedure Before Trial*, § 14:43. It is sufficient that the representative is *similarly situated*, so that he or she will have the *motive to litigate* on behalf of all class members. *Classen v. Weller*, 145 Cal. App. 3d 27, 45.

In analyzing the "typicality" requirement, *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644 is also instructive. In *Caro*, a consumer filed a class action complaint against defendants for, *inter alia*, fraud and deceit, negligent misrepresentation, unlawful, unfair, or fraudulent business practices, violation of the Consumer Legal Remedies Act, unjust enrichment, and falsely advertising food. The plaintiff's complaint alleged that the defendants falsely represented its Citrus Hill products "to be fresh orange juice, made from the heart of the orange, 100% pure orange juice, additive free, and from oranges picked and squeezed on the same day." *Caro* at 652. The plaintiff sought to certify a class composed of "'all' the 'millions of persons' in the United

States who bought Citrus Hill products." *Caro* at 652.

The trial court denied the plaintiff's motion for class certification. The Court of Appeal affirmed, finding that plaintiff failed to establish that his claims were typical of the class, that there would be no substantial benefit to the litigants or the court if the class was certified, that individual issues predominated, and that plaintiff was an inadequate class representative. In affirming the trial court's order, the Court of Appeal noted that the plaintiff testified in his deposition that he did not believe the juice was "fresh" - instead, "the evidence indicated he himself believed the juice was simply 'premium.'" *Caro* at 664.

With that backdrop, the Court finds plaintiffs Delaney and Rosman have not met their burden of showing their claims are typical of those in the proposed classes. They conclude the typicality factor is satisfied "because all members of the class are uniformly and without exception, seeking the same remedy, which is to have Warner-Lambert disgorge its ill gotten gains that *may* have been acquired as a result of Warner-Lambert's unlawful, deceptive and unfair conduct under B&P § 17203."[6] The evidence, however, indicates the plaintiffs' individual claims are *not* typical of the putative class claims. Plaintiffs Delaney and Rosman testified in deposition that they did not see any ads that mentioned Rezulin by name. Delaney Dep. 10:4-14:15; Rosman Dep. 9:17-10:10; 43:10-11. As in *Caro*, the evidence here shows that plaintiffs were not "misled in the manner the class was allegedly deceived." *Caro*, 18 Cal.App.4th at 664. Moreover, there is no evidence that plaintiffs Delaney and Rosman sustained *any* damage as a result of the defendants' alleged UCL and CLRA violations.

For these reasons, the Court finds that plaintiffs have not satisfied the typicality requirement.

---

[6] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 17.

**c. Adequacy of Representation**

"The primary criterion in determining adequacy of representation is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class." *Simons v. Horowitz*, 151 Cal. App. 3d 834, 846 (1984). Additionally, the class representative must "raise claims reasonably expected to be raised by the members of the class." *City of San Jose, supra,* 12 Cal. 3d at 464). The fiduciary duty must be undertaken free of demonstrable conflicts of interest with other class members. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). The "adequacy of representation" requirement has not been precisely differentiated from the typicality requirement. *Caro v. Procter & Gamble, supra,* 18 Cal. App. 4th at 670. Other cases have stated that "adequacy of representation" depends on whether plaintiff's attorney is qualified to conduct the proposed litigation and plaintiff's interests are not antagonistic to the interests of the class. *McGhee v. Bank of America*, 60 Cal. App. 3d 442, 450 (1976).

The Court finds the *McGhee* standard is generally appropriate in determining whether the adequacy of representation requirement is met. Under *McGhee*, the Court finds that counsel is qualified to conduct the proposed litigation, and that plaintiff's interests are not antagonistic to the interests of the class. The Declarations of David R. Markham, Barry A. Fisher, and Kevin M. Prongay all indicate that counsel is experienced in handling similar consumer class action cases. However, as previously discussed, by proceeding only on the "safety" theory of liability, while conceding the "effectiveness" theory, plaintiffs would not be raising all claims "reasonably expected to be raised by the class," and, therefore, plaintiffs' representation would be inadequate. *City of San Jose at 464.* The Court finds that plaintiffs have not satisfied the "adequacy of representation" requirement.

**d. Superiority Not Present**

In deciding whether a class action would be "superior" to individual lawsuits, courts usually consider:

> 1) The interest of each member in controlling his or her own case personally;
>
> 2) The difficulties, if any, that are likely to be encountered in managing a class action;
>
> 3) The nature and extent of any litigation by individual class members already in progress involving the same controversy; and
>
> 4) The desirability of consolidating all claims in a single action before a single court. Weil & Brown, *Civil Procedure Before Trial*, § 14:16 (citing FRCivPro 23(b)(3)).

The first factor weighs in favor of a finding of superiority. Given the relatively small amount of recovery each class member would seek (plaintiffs estimate this would be approximately $2,000 each),[7] each class member would not, comparatively speaking, have a great interest in controlling his or her own case personally.

The second and fourth factors are inter-related. As noted *supra*, the fact that common questions of fact and law do not predominate would make a class action of the sort proposed by plaintiffs more difficult to manage. It would not be desirable to consolidate all of claims in a single action, because this would add to problems in managing the case (i.e., individual trials would be necessary to resolve the reliance and damage issues at the heart of the proposed class actions). To this end, the *Caro* court noted as follows:

> In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action. [Citations.] [¶] In contrast to the streamlined procedure expressly provided by the Legislature, the management of a

[7] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 3.

class action is 'a difficult legal and administrative task.' [Citation.]" *Caro*, *supra*, 18 Cal.App.4th at 644 (citing *Dean Witter Reynolds v. Superior Court*, 211 Cal.App.3d 758, 773 (1989)).

The second and fourth factors weigh against a finding of superiority.

The third factor weighs in favor of a finding of superiority. Defendants essentially concede that "numerous lawsuits of this type have not been filed."[8] While there are approximately 100 cases seeking personal injury damages as part of this coordinated proceeding, those cases do not involve the same controversy as the instant case.

On balance, class certification would not be a superior means to resolve the instant case. The Court finds that plaintiffs have not established the superiority factor.

**III.**

**CONCLUSION AND ORDER**

The Court finds that plaintiffs have not met their burden of showing that class certification is appropriate in this case. The motion for class certification is denied.

Dated: January 15, 2002

ANN KOUGH
Judge of the Superior Court

---

[8] Defendants' Opposition to Plaintiffs' Motion for Class Certification at 31.

# Exhibit H

From:FRANTZ, TOWNSEND 6195257672 06/01/2004 23:40 #718 P.002/009

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

In Re: BAYCOL PRODUCTS LITIGATION MDL 1431

This Document Relates to:

Name of Plaintiff: [ JOSEPH ELICH ]

## CASE SPECIFIC EXPERT REPORT PURSUANT TO PTO 114

1. My name is: NEIL D. LEVINE M.D.

2. My curriculum vitae, including all my publications for the past ten years, is attached. My charges for this review and report are $ 150.00 + 150.00 = 300.00 (5-28-04, 6-2-04) Chart Review Telephone Consult (300 per hour)

3. Attached is a list of cases in which I have testified as an expert, either at trial or in deposition, in the past four years. If no such list is attached, I have not testified as an expert in the past four years.

4. I have reviewed the following medical records of the above patient. My opinion is based on my review of these records. [CHECK HERE IF APPLICABLE: ✓ My opinion is based on my examination of the patient.] I understand that there may be other records for this patient beyond those which I have reviewed:

a. PATIENT'S RECORDS, CHARTS, NOTES, TEST RESULTS

b. HOSPITAL RECORDS, BAYCOL LITERATURE AND EXPERT SUMMA[RY]

5. It is my opinion that this patient has suffered injuries or damages related to this patient's ingestion of Baycol. These injuries include the following:

a. MYALGIAS - BAYCOL INDUCED

SPFS000007jre

Confidential Subject to Protective Order

b. ________________________________________

c. ________________________________________

6. The grounds for my opinion are as follows:

a. There is a claim of injury as described above in the patient's medical records.

b. The claim of injury in the medical records is reasonably contemporaneous with the patient's ingestion of Baycol.

c. There is no other explanation for this injury apparent in the medical records I have reviewed.

d. The injury described is of new onset with the taking of Baycol.

e. The described injury did not grow worse after Baycol was removed.

f. My understanding of statins in general and Baycol in particular. Baycol literature, studies

g. and Baycol litigation expert summaries / reports.

7. I understand, pursuant to PTO 114, that I may supplement this report pursuant to ongoing discovery, including my review of additional medical records.

Date: 6/2/04 X [signature] 6-2-04

NAME: Neil D. Levine, M.D.
ADDRESS: Medical Group of North County
910 Sycamore Ave Suite 276
Vista, CA 92083-7832

(1) I have testified in court as precipient witness @ 12 years ago
(2) I have been expert witness in deposition @ 4 yrs ago and @ 6 yrs ago
(3) I have been precipient witness in @ 2 other deposition cases.

[signature]

SPFS000008jre

Confidential Subject to Protective Order

**ELICH, Joseph (2-19-03)**

S: Joe has had some left-sided lateral hip pain for several months, worse with going up and down a ladder. It is not bothersome to him at night. He is not having chest pain, palpitations, or dizziness, visual changes, or focal motor neurologic difficulties. He is taking Lipitor and in the past Baycol and has had some myalgias, especially posterior calves. He has been off Lipitor for six weeks with no discomfort. He needs to change from Lotensin to Zestril. Health maintenance: Stool cards negative 10/02, PSA/prostate 2/19/03, flu vaccine positive 2/02, eye exam 8/02, lipids 2/19/03, hemoglobin $A_{1c}$ 9/02. He has nocturia x one, no hesitancy, dysuria, frequency, urgency, or incontinence. He has no difficulty with bowel function. He walks daily.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 2-20-03



Confidential Subject to Protective Order

**ELICH, Joseph (10-25-01)**

S: Joe is having nasal congestion, sneezing, and some eye itching and discharge. He is exposed to a newly pollinating tree in his area. He has no wheezing. The patient limits his activities of daily living because of discomfort in the right calf and in the buttocks secondary to peripheral vascular disease. He has no rest symptoms, rashes, or skin breakdown. The patient does not tolerate statins and does not wish any treatment with them because of muscle aches which he does not have off of them. We have discussed possibly the use of Niaspan if his LDL is not at target. The patient is having no muscle aches or pains. He continues to smoke and is not interested in discontinuing. He has no chronic cough. He has no facial discomfort or fever. I have reviewed his Tri-City Open MRI study of 6/01 and ordered a follow-up as recommended for mediastinal adenopathy. This finding has been reviewed with the patient today as well.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 10-26-01

SPFS000010jre

Confidential Subject to Protective Order

**ELICH, Joseph (6-12-01)**

S: For approximately two to three weeks, after doing heavy painting work and moving heavy ladder with up to 15 hours per day of painting with a roller and a brush, the patient has had discomfort in the calves, thighs, and buttocks with activities only, not at rest. There is also one trigger point on the right upper pelvic area posteriorly. The patient has no symptoms overnight or at rest. He has had no swelling of his legs. There have been no rashes. He had some chest discomfort on the lateral left chest wall for several minutes which was dull, possibly related to repetitive motion. His calcium CT score shows moderate risk, but he is unable exercise to do an ETT. I need to obtain his lung score. The patient is having no classic coronary disease symptoms or pulmonary symptoms. He is in good spirits. Data: 5/01 - stool cards x three negative; 4/01 - TFTs, CBC, LFTs, and lipids.

NEIL D. LEVINE, M.D.
NDL:jkc
R: 6-13-01



Confidential Subject to Protective Order

AGE: 69 **PROBLEM-ORIENTED FOLLOW UP VISIT**
DATE: 6-12-01 PATIENT: Joseph Elick ALLERGIES: PCN
MEDS: SEE LIST
DATA:
CC: F/U to discuss CT results ... pains + aches in legs x 1yr

VS: GEN: A and O x 4, NAD Well Kept; Other
ENT: Ears: R: TM: Red NL Fluid; EC NL DC Red: L: TM: Red NL Fluid; EC: NL DC Red
BP: Nose: R: Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear
112/74 L: Mucosa: NL Red Pale Boggy; Phlegm green grey heme clear
Throat: NL Red; Cobblestoning Exudates white gray Lesions: No Yes
P. NECK: Nodes NL ant post cervical supraclav small medium large mobile fixed tender yes no
92 Vessels JVP: NL ↑ ; Carotids: NL Bruit R L Contour NL ↑ ↓
Thyroid NL ↑ Symetric Asymmetric Nodule Multinodular
WT: LUNGS: CTAP Crackles Wheezes Rhonchi RUL RML RLL LUL LLL
Dullness ↓ Fremitus E→A RUL RML RLL LUL LLL
164 C-V: RRR Ømrg M: SEM HOLO DIASTOLIC __/6 ; S3 S4
TEMP PMI NL Displaced toward AAL
Pulses: All NL All NL x ↓: R L PT: R L DP
ABD: Scaphoid Protuberant Obese Soft Nontender BS + BS - Tender Rigid RUQ RLQ LLQ LUQ
ØHSM ↑: Liver ___ cm ↑Spleen - + MASS:
Aorta NP Palpable: ___ cm. Bruit - + RECTAL/PROSTATE:
M-S: DJD: Acute Δ's Chronic Δ's General; Local: Fingers Hands Knees Ankles Feet
NL Inflammation Tender Warm Red Effusion ↓ROM
OTHER:
SKIN: NL Dry ABCD Malignant Lesions Rash:

AK: Scalp ___ Face ___ Neck ___ Upchest ___ UpBack ___ TX-LN2,SAM,PPC, I.C.
RForearm ___ LForearm ___ RHand ___ LHand ___
SK IRRITATED: ___ ;VV: ___ TAGS INFLAMED:
NEURO: NL Screen All Systems Below x
MSE: A&Ox ___ ; CN 2-12: Intact Discs/Fundi- Lesion in CN:
Motor: NL x FOCAL DEFICIT:
Reflexes: NL xFOCAL DEFICIT
Cerebellar: NL ABN: FNF FFM RAM HS Rhomberg Tandom Gait
Sensory: NL x GAIT: NL ABN:
A/P BY PROBLEMS:

SPFS000012jre

F/U

Confidential Subject to Protective Order

**MGNC** Medical Group of North County, Inc.

SAN DIEGO CANCER CENTER

Neil D. Levine, M.D., M.P.H., F.A.C.P.
910 Sycamore Avenue, Suite 270, Vista, CA 92081 (760) 598-1776

Patient Name ELICH, J 5-3-06 Date

**I. Your Lipid Profile:**

Total Cholesterol 216
Triglycerides 149
HDL (good) 37
LDL (bad) 149

**Your Lipid Goals:**

Total Cholesterol < 200
Triglycerides < 150-200
HDL > 40
LDL < ____

**II. Overall, Lipid profile is:** Stay on WelChol

**III. Recommendations:**

- ☐ Diet: low in animal products, fat and red meat; high in fiber.
- ☐ Exercise: 20-30 minutes daily, walking at a low level, or: ____
- ☐ See enclosed cholesterol/choices diet.
- ☐ Begin/continue/change medication to lower cholesterol and meet goals: ____

Medication
Risks: Muscle pains, aches, stomach upset, loose stools, rash or liver damage.
Benefits: Lower risk of heart attack, stroke, death.
Monitoring: Liver blood tests periodically, beginning ____ weeks after medication began. Periodic monitoring will be done per M.D.

- ☒ Other Bring me Home BPs, take 3x/wk minimum. Make visit in 4wks to re-✓ kidneys!

**IV. Other Tests:**

- ☐ Liver
- ☒ Kidneys electrolytes OK; slight loss in function of kidneys, maybe due to not enough fluids!
- ☐ Prostate (PSA)
- ☐ Diabetes (HgbA1c); goal < 7-8
- ☐ Thyroid We need BP < 130/80 and adequate fluids!
- ☐ CBC
- ☐ Other

5/3/04 [illegible]
Mailed

Worddata\datahr\levine\LipidPtHdout



Confidential Subject to Protective Order

2/19/03 13:37 Instrument #:A0572344

MEDICAL GROUP OF NORTH COUNTY
910 SYCAMORE AVENUE SUITE 270
VISTA CA 92083
760-598-1776
KIPPER ADLER JARAMILLO VICARIO DANA LEVINE
FRAKES ROGERS HERGESHEIMER CZVIK BESSUDO

Sample ID: 106236
Name: ELICH JOSEPH ,
Patient ID:
Ca ier/Pos: 8( 1)
Comment:

Age: 71
Sex: M
Doctor: L
Date/Time Run: 2/19/03 13:37

| ASSAY | LOW/HIGH | RESULT | REFERENCE RANGE |
|---|---|---|---|
| TRIGLY | | 141 mg/dL | 1.0 - 200.0 |
| Chol | H | 248 mg/dL | 130 - 200.0 |
| HDL | | 45 mg/dL | 35.0 - 75.0 |
| LDL | H | 177 mg/dL | 20 - 130 |

MAIL TO JOE! ~~CHART~~

1) LDL off STATINS TOO High

2) I suggest beginning ~~Wellchol~~ Welchol to ↓LDL (you shouldn't take "STATINS")

DOSE: 3 TABS 2X/DAY WITH meals

BENEFIT: ↓LDL TOWARDS goal

RISKS: weakness, muscle, joint Aches, Dyspepsia (GI upset)

3) Guidelines Reccommend LDL cholesterol be less than 100.

4) pick up samples.

2-21-03 copy to pt

SPFS000014jre

Confidential Subject to Protective Order

## HISTORY

ADMITTED: 05/21/2002

CLINICAL DATA: This is a 70-year-old gentleman, being admitted for diagnostic angiography and ad hoc percutaneous transluminal coronary angioplasty (PTCA). He has a history of coronary artery disease. In 1989, he apparently had angioplasty. In December 2001, he was treated at Tri-City Medical Center for unstable angina. He was taken to the cardiac catheterization laboratory where his right coronary artery was dilated and stented with a 3.5 x 23 mm stent in the distal vessel and a 3.5 x 13 mm stent in the proximal vessel. Angiographic results were good. The left coronary tree had atherosclerosis, but it was nonobstructing, and his underlying left ventricular function was good. He then did well up until recently, when, in April, he was thought to have possibly had a cerebrovascular accident (CVA). He had slurred speech. A magnetic resonance imaging (MRI) was done; an old lacunar infarct was seen, so it is not entirely clear that the lacunar infarct was the cause of his slurred speech. In any eventuality, he was placed back on Plavix and has done well since then, outside of a recent episode of severe chest pain suggesting restenosis. It is for this reason that he is being readmitted for diagnostic angiography.

PAST MEDICAL HISTORY: The past medical history is significant for an injury to his right foot. He had a dislocated ankle. He had a surgical repair. He has had a cholecystectomy. He has been seen in the past by Dr. Andy Deemer for carotid disease.

Risk factors for coronary disease include hyperlipidemia. He was on Baycol at one point, but had myalgias so it was discontinued, and then subsequently, of course, the drug was withdrawn from the market. He was on niacin for a while, but disliked that because of flushing. He was smoking a pack a day up through December.

SOCIAL HISTORY: He is married. He quit smoking in December. He does not drink.

## PHYSICAL EXAMINATION

GENERAL: On physical, he is a healthy-appearing man, currently in no distress.

VITAL SIGNS: His blood pressure was 104/80. His pulse was 108.

LUNGS: His lungs were clear.

CARDIAC: There were no significant murmurs or gallops.

LABORATORY DATA: The glucose is 341, sodium is 137, potassium is 5.8, chloride is 102, $CO_2$ is 20, BUN is 22, creatinine is 1.7, LDL cholesterol is 114, total cholesterol is 195, and HDL cholesterol is 36. White count is 12.1, hematocrit is 49.4, and platelet count is 218,000.

IMPRESSION:
1. Poorly controlled diabetes.



TRI-CITY MEDICAL CENTER
4002 Vista Way
Oceanside, CA 92056

ELICH, JOSEPH R
MR #707090 RM #HCAT
DOB: [redacted]/1931 AGE: 70
CC TO: NEIL D. LEVINE, M.D.

Confidential Subject to Protective Order

2. Probable restenosis.
3. Status post remote angioplasty.
4. Status post recent percutaneous transluminal coronary angioplasty of the right coronary artery (RCA) with stenting.
5. History of cerebrovascular accident.
6. Hyperlipidemia.

DISCUSSION: The patient will undergo diagnostic angiography. He will be considered for repeat percutaneous transluminal coronary angioplasty.

DAVID A. SPIEGEL, M.D.,FACC

DAS/ID2185/dag
D: 05/21/2002 8:10 A
T: 05/21/2002 8:46 A
#000009407
cc: NEIL D. LEVINE, M.D.
DAVID A. SPIEGEL, M.D.,FACC

SPFS000016jre



ELICH, JOSEPH R
MR #707090 RM #HCAT
DOB: [redacted]1931 AGE: 70
CC TO: NEIL D. LEVINE, M.D.

Confidential Subject to Protective Order

**HISTORY**

ADMITTED: 12/28/2001

CLINICAL DATA: Joseph Elich is a 70-year-old gentleman who presents with chest pain. He has a history of coronary artery disease. In about 1989, he underwent angioplasty. He does not have the details in his head and no old records are available. He did well subsequent to that up until about four weeks ago by his history. His wife actually says he has been having problems since May 2001.

He began experiencing discomfort in his left arm, sometimes radiating across his chest into the right arm. He thought perhaps it was related to bursitis. He had injury to his shoulder in the past. A few weeks ago, he went to get a shot of cortisone but it did not help at all. What he has found, however, as the pain has gotten worse is that rest relieves it and nitroglycerin relieves it. Last night, he awoke with pain. The pain was squeezing in his chest and his arm. His wife says that the symptoms are exactly what he had before he had his last angioplasty.

His risk factors for coronary artery disease include hyperlipidemia. He was on Baycol but he states that it gave him myalgias and he discontinued it and switched to niacin but he did not like the flushing sensation and he discontinued the niacin and is on no cholesterol lowering medicine now. He has also got a history of smoking and continues to smoke a pack per day.

PAST MEDICAL HISTORY: His past medical history is significant for injury to his right foot. Apparently, he had a dislocated ankle and had to have a surgical repair with internal fixation. He has had a cholecystectomy in about 1989. He has recently been evaluated by Dr. Andrew R. Deemer for carotid disease. He was told that his carotids do not look too bad.

MEDICATIONS: His current medical regimen includes:

1. Levoxyl.
2. Lotensin.
3. Ranitidine.

**PHYSICAL EXAMINATION**

GENERAL APPEARANCE: He is a healthy-appearing man in no distress.

VITAL SIGNS: His blood pressure is 149/79. His pulse is 84. Respirations are 18. He is afebrile.

HEAD, EYES, EARS, NOSE AND THROAT: The neck veins are not distended. There are no carotid bruits.

CARDIAC: S1 and S2 are normal. I do not appreciate a significant murmur or gallop.

LUNGS: The lungs are clear.

ABDOMEN: The abdomen is soft.

SPFS000017jre

EXTREMITIES: There is no clubbing, cyanosis or edema.

ELECTROCARDIOGRAM: EKG shows sinus rhythm with a nonspecific ST-T wave abnormality.

X-RAYS: The chest x-ray shows increased vascular markings.

LABORATORY DATA: White count is 15.8, hematocrit 46.7, and platelet count is 181,000. Cardiac troponin is less than 0.3. BUN is 24, sodium 129, potassium 4.4, chloride 99, CO2 24, glucose 268, and creatinine 1.1. CPK is 56.

DISCUSSION: The patient has symptoms consistent with what he had prior to his angioplasty. They are exertional and relieved with nitroglycerin and one has to presume they are due to coronary insufficiency. He also has evidence for glucose intolerance, and some degree of hyponatremia. He also has nicotine abuse and hypercholesterolemia.

At this point, I have recommended diagnostic angiography and ad hoc percutaneous transluminal coronary angioplasty (PTCA) which is what his wife really wants him to have. She volunteers and states emphatically, "I want him to have another angioplasty." He apparently had very good relief the first time around. I told them that it was dependent on what we found at angiography.

I told him the alternative was empiric medical therapy and a noninvasive approach which I think would be acceptable, however, he risks being in the hospital over the weekend and he absolutely refuses to do that and in fact, he initially wanted to go home today and not stay in the hospital. After some discussion, he has decided to go ahead with angiography and ad hoc angioplasty and will proceed in that direction understanding the risks and possible alternatives.

DAVID A. SPIEGEL, M.D.,FACC

DAS/ID2185/mq
D: 12/28/2001 1:18 P
T: 12/28/2001 2:19 P
#000019043
cc: NEIL D. LEVINE, M.D.
DAVID A. SPIEGEL, M.D.,FACC



SPFS000018jre

Confidential Subject to Protective Order

ADMITTED: 12/28/2001

DISCHARGED: 12/29/2001

PRIMARY CARE PHYSICIAN: Dr. Neil D. Levine.

CLINICAL DATA: This is a 70-year-old gentleman who presented with acute coronary syndrome. He was taken directly from the Emergency Department to the Cardiac Catheterization Laboratory. He was found to have a high-grade stenosis in his right coronary artery followed by a more moderate stenosis in the right midright coronary. Both of these areas were dilated and stented using a 3.5-mm by 23-mm stent in the distal vessel, and a 3.5-mm by 13-mm stent in the proximal vessel. The final angiographic results were excellent. He did well overnight without recurrent chest pain. CPKs were normal. The electrocardiogram had no evolutionary changes.

PHYSICAL EXAMINATION: On his examination, his blood pressure was 120/70. He was afebrile. Lungs were clear. There were no significant murmurs or gallops. His groin was well healed.

PLAN: He is discharged home with recommendations to continue his usual medications. He does not want to take statins for cholesterol lowering. He says that they caused muscle discomfort. He will have Plavix 75 p.o. q.d. and aspirin 5 grains p.o. It is requested that he discontinue smoking. He will follow up with his Primary Care physician in one to two weeks. I will see him in the office in six weeks. I will follow him expectantly.

DAVID A. SPIEGEL, M.D.,FACC

DAS/ID2185/nq
D: 12/29/2001 10:38 A
T: 01/02/2002 11:21 A
#000019677
cc: NEIL D. LEVINE, M.D.
DAVID A. SPIEGEL, M.D.,FACC

**DISCHARGE SUMMARY**

SPFS000019jre

Page 1 of 1

**TRI-CITY MEDICAL CENTER**
**4002 Vista Way**
**Oceanside, CA 92056**

ELICH, JOSEPH R
707090
1E 127 02
[redacted]/1931 70

Confidential Subject to Protective Order

CC TO: NEIL D. LEVINE, M.D.